**Robert A. JONES, Appellant,**

**v.**

**John B. CHESTER et al., Appellees.**

**No. 11026.**

Court of Civil Appeals of Texas.

Austin.

Oct. 31, 1962.

Rehearing Denied Nov. 28, 1962.

William P. Fonville, Dallas, for appellant.

Gragg, Storey & Griffith, Brundidge, Fountain, Elliott & Bateman, Dallas, for appellees.

HUGHES, Justice.

Dr. Robert A. Jones, M.D., sued Dr. John B. Chester, M.D., and eight other medical doctors, practicing medicine jointly in what is known as The Chester Clinic and Hospital in Dallas, Dallas County, Texas, for an accounting and for damages for breach of contract in wrongfully terminating his association with the Chester Clinic.

A summary judgment was rendered against Dr. Jones by the Trial Court.

Dr. Jones was employed by the Chester Clinic to practice the arts of his profession in June, 1952. In September, 1952, Dr. Jones was made a member of the clinic with the rights, privileges and obligations contained in the written agreement of that date between himself, Dr. Chester and six other medical doctors. We quote the pertinent or controversial portions of that agreement:

> "This writing and the contract incorporated herein constitutes the entire agreement between the parties and is not executed in consideration of any oral representations made by either party; * * *.

> "That for an (sic) in consideration of the mutual covenants herein contained and the mutual benefits herein granted, the parties hereto do hereby associate themselves for the general practice of medicine, surgery, and allied arts under the firm name of THE CHESTER CLINIC upon the following terms and conditions:

## "1.

"At all times during the continuance of this agreement, the parties hereto, and each of them, shall devote his entire time and skill to the joint interest of THE CHESTER CLINIC and shall not engage in the practice of medicine or surgery to his private benefit or advantage, nor shall any party hereto engage in any other activity which might unreasonably (sic) interfere with the efficient performance of his duties to THE CHESTER-CLINIC.

## "2.

"It is understood and agreed that Dr. John B. Chester shall retain full ownership of all properties of THE CHESTER CLINIC, real, personal, or mixed, including accounts receivable, subject to the succeeding provisions of this agreement and that no right in such properties shall vest in any other party hereto by virtue of this agreement. * * *

## "6 C

"In event any party shall terminate his relations with the other parties hereto by reason of his permanent retirement, disability, or death, then he shall be reimbursed for contributions made by him to the purchase of equipment out of gross receipts of THE CHESTER CLINIC during his service to said Clinic, whether before or after the execution of this contract, upon the following terms: * * *.

## "6 D

"In event any party shall terminate his relations with the other parties hereto by reason of his permanent retirement, disability, or death, he shall be entitled to a proportionate share of the reasonable cash market value of all expendable supplies on hand in said Clinic at the time of such termination. * * *

## "11.

"In event of the death of any party hereto, or in event he shall become permanently disabled or permanently retire from the practice of his profession, in addition to the benefits set out in Paragraph 6, 8, 9, and 10, above, such party, his heirs, executors, or assigns shall be entitled to a proportionate share of the total of all accounts receivable then carried on the books of THE CHESTER CLINIC which have not been outstanding for more than three years immediately preceding such death, disability or retirement. The amount which any party shall be entitled to under this provision shall be the proportion which his average percentage of participation in net profits for the three year period of his service to THE CHESTER CLINIC immediately preceding his death, disability, or retirement bears to the total of such accounts receivable; provided that no party shall participate in the accounts receivable under this provision until he has completed three years of service to THE CHESTER CLINIC. It being agreed and understood that the sum to which Dr. Chester shall be entitled under this provision shall be 30% of said accounts receivable. * * *

## 14.

"It is agreed and understood that Dr. John B. Chester shall be the administrative head of THE CHESTER CLINIC and as such shall be and is hereby vested with the following powers and duties: * * *

"F. He shall have authority to terminate the association of any professional service, including the parties hereto, with the concurrence of a majority of the parties hereto. * * *

## "16.

"This agreement may be terminated by any party hereto, as to such party

only, by giving written notice of intention to terminate to the remaining parties hereto at THE CHESTER CLINIC at least ninety (90) days prior to such termination; provided that such termination shall not effect (sic) the validity of this agreement as to the remaining parties; and provided further that termination by any party for reasons other than death, disability, or permanent retirement shall not entitle such party to any of the benefits contained in Paragraph 6, 8, 9, 10, and 11, above, except as therein expressly provided. * * *

"18.

"In event any party shall voluntarily terminate his association hereunder or in event his association shall be terminated for any reason other than permanent retirement, disability, or death, then such party shall and hereby does waive any and all rights and benefits under this contract including disability payments, sick leave, property purchase and reimbursement benefits, and participation in accounts receivable and it is hereby stipulated by the parties hereto that the money value of such rights and benefits shall be and are considered as liquidated damages payable to the remaining parties hereto, it being understood and agreed that the actual damages caused by such termination, though material, are uncertain. * * *

"20.

"It is agreed and understood that any and all contracts and agreements, oral or written, heretofore entered into by and between any party or parties hereto with any other party or parties hereto are hereby cancelled and any and all rights and benefits gained by virtue of such contracts and agreements, except as expressly retained herein, are hereby waived."

This contract was for a term of years ending December 31, 1984.

In April, 1960, after Dr. Jones had been associated with the Chester Clinic for about eight years, Dr. Chester handed him a draft of a proposed new agreement, less advantageous to Dr. Jones and which would have cancelled the previous agreement of Dr. Jones with the clinic.

Dr. Jones declined to accept this new contract, whereupon he was advised by Dr. Chester that he would have to sign the agreement or leave the clinic. After some negotiation between Dr. Jones and Dr. Chester, appellant finally refused to enter into a new contract. Dr. Chester thereupon delivered to Dr. Jones the following letter:

"June 21, 1960

"Dr. Robert A. Jones
Lancaster, Texas

"Dear Dr. Jones:
    "All of the parties to your agreement of association with Chester Clinic & Hospital, dated October 1, 1952, have previously agreed upon the periodic adjustment of the proportionate part of the net profits to be received by you. Your failure to agree to to this adjustment, as provided in your contract, can be interpreted by the members of the association in no other way than as a voluntary termination on your part. Please be advised, therefore, that your termination is accepted by the remaining member doctors effective June 30, 1960.
        "Very truly yours
        THE CHESTER CLINIC &
        HOSPITAL
        By: s/ Dr. John B. Chester"

The relationship between Dr. Jones and the Chester Clinic was terminated on the date stated in this letter.

The reason for the action of Dr. Chester and his associates in terminating the con-

tract with Dr. Jones is given by Dr. Chester as follows:

"For several years prior to June 22, 1960 it was the consensus of all the members of the organization except Dr. Jones that the plaintiff, Dr. Robert A. Jones, failed to produce sufficient business and income to warrant the percentage of the net profits of the said Chester Clinic (the name of which was later changed to The Chester Clinic and Hospital) received by the said Dr. Robert A. Jones. In the period from August 1, 1958 to June 30, 1960, a period of twenty-three months, the total charges placed upon the books of the said Chester Clinic and Hospital by the said Dr. Robert A. Jones totaled $56,-521.90, whereas, in fact, the said Dr. Robert A. Jones withdrew from the said Chester Clinic and Hospital, for and during said period, as his agreed share of the net profits, the total sum of $76,174.15, or more than $19,000.00 over and above his total contributions to the gross income of said Clinic and Hospital; that these facts were discussed by the affiant and other members of the said Clinic and Hospital from time to time, and in the spring of 1960, the exact date of which I do not now remember, it was unanimously decided by all of those associated with the said Clinic and Hospital, with the exception of the said Dr. Robert A. Jones, that his association with the said Clinic and Hospital would not be continued on the same basis, but that he should be offered a new contract which would eliminate his participation in the net profits of the entire Clinic and Hospital, but which would allow him a certain substantial percentage of the total charges made by him and placed on the books of the Clinic and Hospital by him, regardless of the collectibility thereof; * * *.

" * * * that the said new contract was presented and proposed to the plaintiff by me at some time shortly prior to June 22, 1960, but Dr. Robert A. Jones refused to sign or agree to the terms thereof. Feeling that this constituted a voluntary termination of his association with The Chester Clinic and Hospital, I then presented to him, on or about the 22nd day of June, 1960, a letter in writing bearing said date, in which I told him that his failure to agree to the proposed adjustment could be interpreted by the members of the association of no other way than as a voluntary termination on his part, and that his voluntary termination was accepted by the remaining member doctors, effective June 30, 1960."

Dr. Jones replied as follows:

"At the time of my entering into my contract with the Clinic, I stated to Dr. John B. Chester, with whom that contract was negotiated, that inasmuch as I was to engage in the general practice of medicine for the Clinic, I would not be able to produce as much business, or practice, and gross income for the Clinic as those members practicing surgery and other specialties would produce and I was thereupon advised by Dr. John B. Chester that it was not expected that I would produce as much business, practice, or gross income as those members of the Clinic practicing surgery and other specialties, and that in the operation of a clinic operated for the purpose of providing to its patients a full range of medical service, it was essential to have the services of a general practitioner such as I, and that I was not expected to produce as much business, or practice, or gross receipts equal to the amounts of net profits provided to me under the contract."

Dr. Jones takes the position that his contract with the clinic could be terminated only for cause and that such cause must be alcoholism, dope addiction or failure to perform his duties under the contract. Sup-

porting this contention he cites his following testimony:

"Q What is your understanding with respect to what the clinic could do with respect to separating you from the clinic?

"A My understanding was that, under extreme provocation, such as dope addiction, alcoholism, refusal to carry out my part of the contract, by unanimous consent of the parties, that I could be separated from the clinic, but that under those circumstances that my equity would be yet granted to me.

"Q Well, Doctor, your understanding about those things was based upon your reading and interpretation of the written contract, wasn't it?

"A Plus repeated oral assurances.

"Q That is what I want to get to. Who gave you repeated oral promises?

"A Dr. Chester, Dr. Barnes, Dr. Krebs."

Dr. Jones testified that these oral statements were made to him both before and after the contract was executed.

Dr. Jones in his pleading asked for reformation of the contract with the Clinic to conform to the oral representations as to cause for termination of the contract, and that his income for the Clinic should not be required to equal his withdrawals; also he urged an estoppel based on those representations.

Appellant prayed for damages for breach of contract and for an accounting of the assets of the Clinic in accordance with the contract.

There is no basis for reforming the contract to conform to oral representation on the part of Dr. Chester before the execution of the agreement or to conform to subsequent representations made by some, but not all, of the parties to the contract.

■ No authority is required to sustain the principle that prior negotiations of parties to a written contract, complete in itself and unambiguous, are, in the absence of evidence to show fraud, accident or mistake in their omission from the written contract, merged in the writing. There is no evidence here of any of those factors.

The above principle has especial force and application where, as here, the contract expressly excludes oral representations made by either party. Rogers v. J. I. Case Company, Tex.Civ.App., 272 S.W.2d 429, Waco Civil Appeals, and authorities therein cited.

■ Insofar as reformation of the contract is concerned, this cannot be accomplished without the agreement to modify being given consent by all the parties to it. 13 Tex.Jur.2d., Contracts, Sec. 267, p. 496. There is no evidence here that all parties to the agreement agreed to its modification; hence there is no basis for reformation of the agreement.

■ The law is clear that parties may agree that contractual relations between them may be terminated at the election of either party and that such agreements, if fairly made and not inequitable are enforceable. Haley v. Nickels, Tex.Civ.App., 235 S.W.2d 683, Austin Civil Appeals, and authorities therein cited.

Affirming the fairness of the privilege of terminating this contract as to Dr. Jones are his own words when a change in their relations was first suggested by Dr. Chester, "I told him that I thought that the situation had been too good to last, that it had been a very profitable and agreeable association, that I wasn't particularly surprised."

■ Another indication of the fairness of the terminal provision is that it could be enforced against an associate only by concurrence of a majority of the parties to the contract. The disassociation of Dr. Jones was accomplished strictly in accordance with the terms of the contract.

For doing what the contract authorized, and in a proper manner, appellees cannot be held responsible in damages to appellant.

This brings us to a consideration of damages sustained by appellees.

The contract plainly provides that if withdrawal of an association is occasioned by permanent retirement, disability or death, certain benefits go to the party or his representatives. Applicability of these provisions is not claimed.

The contract also plainly provides that termination "by any party for reasons other than death, disability, or permanent retirement shall not entitle such party to any of the benefits" claimed by Dr. Jones.

The contract also plainly and affirmatively provides that if termination is "for any reason" other than death, disability or permanent retirement then the disassociated party shall waive the benefits claimed by Dr. Jones and agrees that the money value of such rights shall be payable to the remaining parties as liquidated damages.

This provision as to liquidated damages, if valid, is conclusive against Dr. Jones. It is our opinion that it is unreasonable, and invalid. 17 Tex.Jur.2d, Damages, Secs. 151–167.

Before discussing our reasons for this conclusion we first must dispose of appellees' contention that paragraph "2" of the contract gives Dr. Chester "ownership" of all assets of the clinic. This "ownership" is plainly a qualified ownership. It is expressly subject to the "succeeding provisions of this agreement." It is clear from this provision and other specific terms of the agreement that the members of the association have beneficial interests in the assets of the clinic. The contract expressly limits Dr. Chester's absolute ownership of the accounts receivable to 30%. Conclusive, we believe, on this question is the liquidated damage clause, upon which appellees heavily rely. If Dr. Jones owned no rights in the assets of the clinic there would be no need for the contract to provide

the circumstances under which he would waive these rights and agree that the money value of these rights should be paid to the remaining associates as liquidated damages.

■ Next we must dispose of the contention made by appellees that the withdrawal of Dr. Jones from the clinic was voluntary. The record does not sustain this contention, the only basis for which is the self-serving statement in the letter of June 21, 1960, to Dr. Jones to the effect that his failure to agree to a new and less favorable contract was taken to mean a voluntary abandonment of the old and existing agreement, coupled with the continuance of Dr. Jones to work in the clinic until June 30, 1960, the effective date of termination of the contract set by appellees.

Every action and statement of Dr. Jones is opposed to his voluntary withdrawal from the clinic. It was extremely disadvantageous for him to withdraw; that he would voluntarily withdraw is almost incredible. He would lose an income greater than it appeared he would otherwise earn, and he would subject himself to substantial losses by way of liquidated damages.

We do not believe that the fact that Dr. Jones peacefully vacated the clinic when ordered to do so by appellees can be taken as a voluntary withdrawal. Nor do we believe that his remaining in the clinic the short interval between June 21st and June 30th of any significance. If he had vacated prior to June 30th, it could be more forcefully argued that his withdrawal was voluntary.

It is our opinion that this record reflects nothing but an involuntary withdrawal by Dr. Jones from the clinic. It is true that he was not forcibly ejected. The law does not favor and certainly does not require such resistance in order to preserve one's rights.

■ In the following discussion of the liquidated damage provision of the agreement, we exclude any application of it to

a voluntary withdrawal from the clinic by an associate.

The liquidated damage provision is not fairly commensurate with the damage to the clinic caused by the involuntary withdrawal or expulsion of Dr. Jones. According to the pleadings, the money value of the rights owned by Dr. Jones which would be forfeited to the remaining associates as liquidated damages is $63,215.14.

Here, the facts are without dispute. Dr. Jones was not a financial asset, comparatively, to his associates, and for this reason alone he was expelled. Who benefited from this action? According to the record, only the remaining associates benefited. Certainly no financial damage of any kind accrued to the clinic. Dr. Jones only suffered financial damage.

Under these circumstances, we are of the opinion that the provision for liquidated damages is in the nature of a forfeiture only, wholly unrelated to any damages actually sustained by the clinic or which could have reasonably been anticipated as likely to befall the clinic by the parties when the agreement in suit was executed. To enforce forfeiture of Dr. Jones' property rights would be unconscionable.

■ We find no merit in appellant's plea of estoppel based on statements credited to some of appellees' respecting appellant's rights and obligations under the contract. Appellant's knowledge of the truth of these matters was equal to the knowledge of such appellees. Hence there was no deception, and no estoppel. 22 Tex.Jur. 2d, Estoppel, Sec. 14.

It is our opinion that the Trial Court erred in rendering summary judgment against Dr. Jones. We, therefore, reverse and remand this cause.

Reversed and remanded.

## ON MOTION FOR REHEARING

■ Appellees direct attention to an amendatory contract executed by the parties subsequent to the contract of September 1952. Omitting formal parts, we quote this contract in full:

"I.

"It is agreed that the original articles of association dated February 15, 1952, and amended May 15, 1956, are hereby amended so as to extend the terms for an additional period of ten years from and after its present termination date, it being the intention of the parties that such original articles of association shall extend through, and including, December 31, 1984. It is agreed that all the terms and provisions of the original articles of association and any subsequent amendments thereto unanimously agreed upon by members of the association shall be, and remain, in full force and effect until December 31, 1984, and no provision of such original articles or amendments thereto shall be changed or altered by reason of this amendment. It is also agreed that Dr. John B. Chester shall be authorized to extend the lease agreement between the LANCASTER MEDICAL CENTER, INC., Lessor, and THE CHESTER CLINIC & HOSPITAL, Lessee, for the additional term covered by this agreement, on the same rental terms now existing between said Lessor and Lessee.

"II.

"It is further hereby agreed that it is the intent of all members of this association for the association to continue under the same terms of the original contract effective January 1, 1952, and as subsequently amended, until December 31, 1984, and that all provisions of the original articles of association and amendments thereto, shall remain in effect regardless of the death, retirement, or termination of any member of the members of the association, and that nothing shall terminate said association except an unanimous vote

of the members thereof, or the successive termination of the association of the individual members of the association as provided in the articles of association.

"It is further agreed by each and every member of the association and their respective spouses, that no reimbursement shall be forthcoming to any member or his heirs if association is terminated in any manner including death, disability, retirement, or voluntary or involuntary termination under the provisions of the articles of association except those benefits specifically described in said articles of association, and that said specified benefits, if any, is in lieu of any rights said associate or his heirs might have in any of the assets of the Clinic, and specifically including the value which might be placed on goodwill. It is further agreed by each party and his heirs that no suit in a court of law will be entered into designed to increase the benefits specifically outlined in the original articles of association, as amended, in the event of the death, retirement or termination, for any cause, of said associate."

It is our opinion that this contract does not alter the conclusion reached by us invalidating the liquidated damage clause of the basic agreement. This subsequent agreement stresses the point that benefits specifically provided for the disassociated member and his heirs are to be accepted in lieu of such member's interest in the assets of the clinic. There is nothing in the contract to aid appellees in claiming a forfeiture of appellant's interest in these assets. It has, it seems to us, the very opposite connotation: Assets are to be surrendered for benefits. The idea of forfeiture is completely absent.

Appellees seem to sense the futility of their position when they say:

"The unfortunate language used in the so-called liquidated damage provision cannot properly be said to create a beneficial interest or ownership in assets. The most that can be said of it is that it is evidentiary, but it becomes of no value as evidence in the light of the other contractual provisions wherein it is expressly stipulated that no such interest is or can be acquired by the members of the association."

The liquidated damage clause may be unfortunate from appellees' point of view, but it is part of the contract made by the parties and, in our opinion, assumes paramount importance when reliance upon it helps defeat the most unjust of all legal claims, forfeiture.

The motion is overruled.