General Electric Company *v.* N. K. Ovalle, Inc., Appellant.

Argued May 22, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, STERN and BARNES, JJ.

*Douglass D. Storey,* with him *John B. Pearson,* for appellant.

*John McI. Smith,* with him *Paul G. Smith,* for appellee.

OPINION BY MR. JUSTICE STERN, June 19, 1939:

On May 1, 1930, plaintiff, a corporation engaged in the manufacture of electrical appliances and equipment, entered into a written contract with defendant superseding a similar agreement between them dated July 1, 1928. Its principal terms were as follows: Defendant was to be the distributor of General Electric refrigerators in a territory comprising a large number of counties in central Pennsylvania, and plaintiff was not to make sales of its refrigerators there so long as defend-

ant maintained the sales quota set for that territory. Defendant was to furnish plaintiff an estimate of its sales for each ensuing year and plaintiff undertook to give these estimates its careful consideration but did not agree absolutely to supply the requirements. Plaintiff was to sell the refrigerators to defendant at 40% discount from the current list prices, but both prices and discounts were to be subject to change by plaintiff without notice. Defendant was to pay plaintiff in cash or by accepting and paying sight drafts attached to bills of lading; in the event that such drafts were not honored by defendant upon presentation, or if defendant should become otherwise indebted to plaintiff, the latter was to have the right to withhold further shipments until all indebtedness to plaintiff should have been fully paid. Defendant was not to assign the agreement or any interest therein without plaintiff's written consent.

The contract contained the following clause: "This agreement shall continue in force and govern all transactions between the parties hereto until cancelled or terminated by either party, but it is agreed that either party shall have the privilege, with or without cause, to cancel and annul this agreement at any time upon thirty days' notice . . ." If defendant ceased to function as a going concern or a receiver was appointed or a bankruptcy petition filed by or against it, plaintiff might cancel the agreement on two days' notice. Another clause provided: "Upon termination of this agreement by cancellation or otherwise, the Manufacturer [plaintiff] shall not be liable in any manner whatsoever on account of such cancellation or termination, even though thereafter the Manufacturer or a new distributor may complete any deals inaugurated by Distributor [defendant]."

On December 19, 1933, plaintiff served on defendant thirty days' written notice of cancellation, and on January 18, 1934, the contract was accordingly terminated.

On January 11, 1934, plaintiff brought the present suit to recover the amount due from defendant for merchandise delivered, plaintiff having extended credit to defendant notwithstanding the cash provision of the contract. Defendant admitted liability in the sum of $167,607.01, but filed a set-off and counterclaim, averring that plaintiff had waived its right to cancel the contract without cause, that the cancellation was an illegal act, and that it damaged defendant to the extent of $300,000. The jury rendered a verdict in favor of defendant in the sum of $350,078.29.[1] The court below sustained plaintiff's motion for judgment n. o. v. and entered judgment in its favor in the sum of $167,607.01 with interest, a total of $201,704.19. Defendant appeals.

Since, under the terms of the contract, either party had the absolute right to cancel the agreement at any time "with or without cause," plaintiff was not obliged to assign reasons for cancellation, nor were its motives material: *Orth & Bro. v. Board of Education,* 272 Pa. 411, 418; *McDermott v. Reiter,* 279 Pa. 545, 549; *C. I. T. Corporation v. Flint,* 333 Pa. 350, 356, 357. Defendant rests its case upon alleged statements made by representatives of plaintiff which defendant claims estopped plaintiff from exercising its right of cancellation without cause. These statements, denied by plaintiff but established by the verdict of the jury, may be summarized as follows: (1) At an annual convention of plaintiff's distributors, one hundred in number, held in August, 1931, T. K. Quinn, who was General Manager of plaintiff's Refrigeration Department, and later Vice-President in charge of Merchandising, stated in an address that the difficulties the distributors were experiencing were the result of the depression; that the distributors should have courage and confidence in

---

[1] It will be noted that although defendant counterclaimed for only $300,000, the jury awarded it $350,078.29, in addition to expunging the indebtedness of defendant to plaintiff, making a total award to defendant on its counterclaim of $517,685.30.

their country; that they had every reason to have confidence in the General Electric refrigerator; that they should have confidence in the General Electric Company; that if they had sustained or would have to sustain losses, after doing everything they could to operate as economically as possible, they should still keep up courage; that they should not destroy their organizations; that they should continue their fight and consider any losses sustained as investments which, when conditions got normal, they would be able to recoup from future profits; and that they would receive such financial assistance from plaintiff as might be required. (2) At various times in 1931, 1932 and 1933, defendant complained to P. B. Zimmerman, who was Sales Manager of plaintiff's Refrigeration Department, later General Manager of the Refrigeration Department, and still later General Manager of the Appliance Sales Department, that defendant was losing money on the commercial, as distinguished from the domestic, refrigerators. Mr. Zimmerman replied that defendant should have confidence; that the commercial refrigerators would some day be the big support of the distributors' business; that the distributors must realize that to introduce these refrigerators they had to lose money, but that not only would they get their losses back but these losses would be investments which in time would produce profits. (3) At a regional conference of distributors in 1930 defendant urged upon Mr. Quinn that the discount to the distributors should be increased, to which he replied that defendant must realize there was no definite yardstick by which the correct discount could be found, but that defendant and the distributors generally should have confidence in plaintiff that if the discount was not correct plaintiff would make it right in the future.

Defendant asserts that these statements conveyed the inference that plaintiff would not cancel its contracts with the distributors without cause until a restoration

of normal conditions would enable them to recoup all intervening losses, and that defendant accordingly retained the major portion of its organization and went ahead with its business operations in reliance upon them.

In its brief defendant says it "is not suing to enforce oral promises." It also states that it "is not suing for the failure to render financial assistance." It does not claim that any of the remarks made by Mr. Quinn or Mr. Zimmerman effected a *contractual* modification of the original agreement. Obviously such a contention would have been hopelessly untenable. "Such financial assistance as might be required," without the fixing of any standard by which to measure the requirements, is too vague a commitment to justify legal recognition. A contractual promise cannot be judicially enforced unless it is sufficiently definite to enable the court to ascertain the intention of the parties to a reasonable degree of certainty: *Smith v. Crum Lynne Iron & Steel Co.,* 208 Pa. 462, 466; *Edgcomb v. Clough,* 275 Pa. 90, 103; *McNeely v. Bookmyer,* 292 Pa. 12, 15; *Seiss v. McClintic-Marshall Corporation,* 324 Pa. 201, 204, 205. Parenthetically it may be noted that plaintiff furnished to defendant financial assistance in the form of credit amounting at one time to as much as $220,000, but reduced, by the time the present action was brought, to $167,607.01. As to the promise concerning the rate of discount, what increase "would make it right" is something that no court can determine. Plaintiff did, on two occasions, increase the rate until it reached 45% instead of 40% as provided in the contract.

The basis of defendant's counterclaim is thus reduced to the proposition that plaintiff cannot set up the right of cancellation without cause as a defense to defendant's claim for damages because plaintiff waived that right when it encouraged the distributors to keep up their organizations, to "continue their fight," and to regard their losses as investments which would give way to profits upon the reappearance of normal times.

How could these results be accomplished, asks defendant, if the opportunity to achieve them was taken away by plaintiff's cancellation of defendant's contract while the bad times still continued? And what good could result to defendant from an increase in the discount allowance, or the furnishing of financial assistance, or a greater demand for the commercial refrigerators, if defendant's business had to be discontinued?

Plaintiff asserts that it had good reasons for cancelling the contract with defendant, but we need not discuss those which it advances because we are of opinion that the statements relied upon by defendant did not estop plaintiff from exercising its right to cancel without cause, and, furthermore, that defendant did not establish that it was the cancellation which caused the damages it claims.

Whether an estoppel results from established facts is a question for the determination of the court: *Keating v. Orne,* 77 Pa. 89, 93; *Cox v. Rogers,* 77 Pa. 160, 168; *Pittsburg Construction Co. v. West Side Belt R. R. Co.,* 227 Pa. 90, 99; *Converse v. Paret,* 228 Pa. 156, 161; *Laidley v. Rowe,* 275 Pa. 389, 396, 397. It is for the jury to say whether alleged remarks were made, but it is for the court to decide whether they are susceptible of the inferences attributed to them. That statements should give rise to an estoppel they must be clear and reasonably certain in their intendment. Those upon which defendant claims to have relied did not deal with facts but with the future. Did they give rise, as defendant claims, to a promissory estoppel? This could have resulted only if they clearly expressed an intention on the part of plaintiff to abandon the right of cancellation so that plaintiff should reasonably have expected that they would be so construed by the distributors and relied upon accordingly: Restatement, Contracts, section 90; *Fried v. Fisher,* 328 Pa. 497. In our opinion the statements made by Mr. Zimmerman and Mr. Quinn will not reasonably bear any such con-

struction. To believe that it was intended by such commonplace, platitudinous "pep" talks to waive the right of cancellation without cause in all the company's contracts verges upon the preposterous. The distributors knew the terms of their contracts and must have realized that if, in individual cases, circumstances should indicate the desirability of cancellation, it could not have been in contemplation that the right to terminate should be affected by the general remarks made by these speakers. If the right of cancellation without cause was waived, it would necessarily follow that the same statements brought about a waiver also of the clause permitting plaintiff to refuse further shipments until all accumulated indebtedness was paid, as well as other provisions which would have enabled plaintiff as a practical matter to terminate the contracts as effectually as by direct cancellation. Moreover, the waiver of the right to cancel without cause would have made the contracts of indefinite and even permanent duration, no term being otherwise provided therein. It is inconceivable that the distributors could have seriously thought that the statements of plaintiff's representatives were so intended,[2] nor is there any evidence that any of the distributors, other than defendant, did so construe them, or that defendant itself so regarded them until years after the statements were made and until an imminent crisis in its financial affairs had developed.

There are other reasons why defendant's counterclaim must be rejected. Even if the statements were made as claimed, and even if they were reasonably capable of bearing the inferences attributed to them, de-

---

[2] Defendant, evidently realizing this improbability, argues that the waiving of the clause permitting cancellation without cause should be held to be limited to a "reasonable" period even though the losses still continued. But this saving qualification is not warranted by the alleged statements and cannot arbitrarily be fastened upon them by way of interpretation.

fendant failed to prove that either Mr. Quinn or Mr. Zimmerman had authority to commit plaintiff to such a result. Mr. Zimmerman signed the contract with defendant as Sales Manager of plaintiff's Electric Refrigeration Department, but, assuming—what is more than doubtful—that an agent authorized to make a contract is thereby necessarily vested with the implied power to rescind or modify it or to waive rights of his principal in regard to it (as to which see Restatement, Agency, section 51, comment on clause (b), paragraph (c), it by no means follows that such authority would extend to a wholesale renunciation at one and the same time of the right of cancellation without cause in all of the distributors' contracts. There is a great difference between dealing with an individual contract in the day-by-day routine of business, and the elimination for an indefinite period of an optional cancellation clause in all of the contracts, involving, as it would, a change vitally affecting general policies and making possible the incurring by plaintiff of tremendous losses. No sales manager, general manager, or vice-president would have such power. To promise one hundred distributors that plaintiff would not without cause cancel their contracts until the problematical return of better times, so that thereby they might be able to recover all of their then existing and future losses—an indeterminate amount of losses during an unlimited number of years, and possibly due in many cases to poor management (as, indeed, plaintiff claims was the reason for defendant's losses[3])—would be so far out of the ordinary course of business that no agent of a corporation, however highly placed, could be considered as having such implied authority: *Manross v. Warr-Penn Refining Co.*,

---

[3] Plaintiff claims that defendant's losses were due partly to over-expansion in the number of its stores, partly to an ill-advised venture in which defendant took over the General Electric territory in northeastern Pennsylvania, partly to extravagant operation, and partly to excessive withdrawals by defendant's president.

*Inc.,* 312 Pa. 241; *Severance, Trustee, v. Heyl & Patterson, Inc.,* 123 Pa. Superior Ct. 553, 563, 564. Nor was Mr. Quinn nor Mr. Zimmerman held out as having any such power as defendant would ascribe to them. Defendant failed to establish either actual or apparent authority to bind plaintiff in the manner claimed.

Finally, all that defendant at best can claim is that plaintiff, because of a promissory estoppel, is committed —not to underwrite defendant's losses—but, by renouncing the right to cancel its contract without cause, to give defendant the *opportunity* of recouping in prosperous years the losses incurred and that might thereafter be incurred during the years of the depression. It was therefore obligatory upon defendant to prove that if this opportunity had been afforded it would have been able to take advantage of it and continue its business until, sooner or later, its losses would be obliterated. So far, however, from proving this, it admitted facts which indicated exactly the contrary. Its own evidence showed that in August, 1931, it had a surplus of $11,427.44 over and above a capital of $110,000 (of which $97,000 had been paid in cash and $13,000 represented good will). By the end of that year it had a deficit of $67,912.83, at the close of 1932 a deficit of $166,851.97, and in January, 1934, when the contract was cancelled, a deficit of $187,067.69. It was then indebted to plaintiff in the sum of $167,607.01, and to Harrisburg Trust Company in the sum of $70,000. Its financial condition was growing steadily worse. Even if it were to be held that plaintiff's alleged waiver included also a renunciation of its right under the contract to refuse further shipments until defendant paid its indebtedness to plaintiff, certainly the latter was not obliged to extend additional credit, but could insist that all transactions thereafter should be for cash as provided in the contract. Defendant, having exhausted its credit both with plaintiff and with the Trust Company, was on the verge of enforced liquidation.

Indeed it would have been compelled to liquidate in 1933 had plaintiff not agreed at that time to subordinate its claim against defendant to that of the Trust Company. Defendant was therefore far from proving that had the contract not been cancelled by plaintiff it could have continued in business and ultimately regained its solvency. In the absence of such proof, the cancellation of the contract, even if legally unwarranted, was not established as the real cause of the damage for which the verdict in favor of defendant was awarded.

The judgment is affirmed.