HAVEG CORPORATION, a corporation of the State of Delaware, and Haveg Industries, Inc., a corporation of the State of Delaware, Defendants Below, Appellants,

v.

Hubert A. GUYER, t/a Hubert A. Guyer Company, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Jan. 17, 1967.

See also: 211 A.2d 910.

John P. Sinclair, of Berl, Potter & Anderson, Wilmington, for appellants.

Howard M. Handelman, of Bayard, Brill, Russell & Handelman, Wilmington, for appellee.

WOLCOTT, C. J., CAREY, J., and DUF-FY, Chancellor, sitting.

WOLCOTT, Chief Justice.

This is an appeal from the Superior Court's denial of a motion to set aside the verdict of a jury and to enter judgment for the defendants in accordance with their motion for a directed verdict at the close of the evidence.

This action was brought by Hubert A. Guyer, trading as Hubert A. Guyer Company (hereafter Guyer) for breach of contract against Haveg Corporation and Haveg Industries, Inc. (hereafter collectively Haveg.) The contracts were for the supplying of all Haveg's requirements for the "chopping" and "bias slitting and sewing" of a phenolic material used by an operating division of Haveg for the insulation of rockets and missiles. The material was used specifically for the insulation of nose cones against their re-entry into the earth's atmosphere. The alleged contracts which Haveg is charged with having breached were oral and have never been reduced to writing.

▇ The denial of Haveg's motion for judgment notwithstanding the verdict requires us to examine the record to determine whether or not there was evidence which required that the issue of contract or no contract should have been submitted to the jury for decision. In so doing, we must of course do so in the light most favorable to Guyer. Chrysler Corp. v. Quimby, 1 Storey 264, 144 A.2d 123. Furthermore, by reason of Art. IV, § 11 of the Constitution, Del.C.Ann., we are required to uphold the finding of a jury if it is supported by evidence. Obviously, the jury in this cause found that the oral contracts existed since it returned a verdict for Guyer in the amount of $21,000.00.

The facts are that in December of 1958, Guyer was approached by a project manager of Haveg in connection with the serration of phenolic nylon tape. Guyer was taken to the manager of one of Haveg's divisions and was asked to quote a price, which he did. Guyer then developed a method of serration and performed serration of the tape upon purchase orders for awhile. Soon Haveg's division manager asked Guyer to agree to supply all of Haveg's serration requirements in return for its promise to take all their requirements from him. Guyer was instructed, thereafter, to work with the project engineer. Guyer agreed, although he knew that serration, in time, would probably be replaced by another project.

The serration work monopolized most of Guyer's time, and he was forced to discontinue the manufacture of a profitable door closer which he had made prior to this. Throughout the time Guyer was engaged in the serration work, he told the project engineers and various purchasing agents of Haveg that he had an exclusive requirements contract with Haveg for serration. He, in fact, was given 100% of Haveg's serration work.

In January, 1960, the specifications for re-entry cones changed from serration to bias slitting and sewing of the same phenolic nylon tape. Haveg sought a contract with the General Electric Missile and Space Vehicle Department for certain of the components. To obtain this contract Haveg was required to have a source for bias slitting and sewing within ten days.

When no source could be found, the general manager of Haveg, the manager of Haveg's missile program, and Haveg's project engineer agreed that the project engineer should discuss with Guyer the possibility that he could supply Haveg's requirements. The project engineer called Guyer from Philadelphia and met him that night at his factory to discuss the matter.

The project engineer and Guyer discussed the matter in the presence of Guyer's secre-

tary. Guyer was promised that if he developed the equipment necessary to do the work, he would get all of Haveg's requirements for that work. Guyer agreed to supply all of Haveg's requirements under that arrangement and proceeded to develop the necessary equipment for it.

Guyer commenced performance, continuing to assert to the successor project engineer and various purchasing agents that he had an exclusive contract. He in fact was given all of Haveg's requirements for bias slitting and sewing work until August 14, 1962, at which time he claims Haveg breached the oral exclusive requirements contract.

In February, 1960, the project engineer came to Guyer and asked him to chop the tape into half-inch squares. At that time Haveg's chopping requirements were obtained on the West Coast and the freight charges were heavy. The project engineer promised Guyer that if he built the necessary equipment to chop the tape he would be given an exclusive requirements contract at the approximate amount of 1000 pounds a day. Guyer agreed. At later times, Guyer discussed the chopping contract with Haveg's division manager and the manager of Haveg's missile program.

Guyer developed a chopper but he was never given all of Haveg's requirements for chopped material, although this ran to about 1000 pounds a day.

The foregoing statement of facts is taken largely from the testimony of Guyer. Haveg's witnesses, of course, deny that Guyer was ever promised an exclusive requirements contract, but they corroborate his testimony in other respects. In any event, the jury could, as it apparently did, reject Haveg's evidence along this line and accept Guyer's version.

On August 14, 1962, Guyer claims Haveg breached the contract for bias slitting and sewing, and further claims that Haveg breached the chopping contract from its inception.

Haveg argues that the trial court committed error in permitting Guyer to use the doctrine of equitable estoppel as a "sword" and not a "shield." Apparently, Haveg is of the opinion that Guyer was permitted to submit to the jury the theory that an equitable estoppel existing against Saveg established the contracts allegedly breached.

█ The doctrine of equitable estoppel is that a person not otherwise liable as a party to a transaction may nevertheless become subject to liability on the transaction to a person who has changed his position because of his belief that the transaction was entered into when he carelessly permitted such belief to exist, or when knowing of the belief, he did nothing to notify the other party of the erroneous belief. Wolf v. Globe Liquor Co., 34 Del.Ch. 312, 103 A.2d 774; Restatement of Agency 2d, § 88.

The difficulty with Haveg's argument in this respect is that the trial court clearly instructed the jury that under the principles of equitable estoppel Guyer could not recover damages for breach of contract but would be limited to an amount compensating him for the loss occasioned from his reliance on Haveg's supposed promises and to a reasonable sum required to permit Guyer to rearrange his affairs upon discovering that no contract existed.

█ It is apparent, therefore, that the trial court did not permit Guyer to establish the existence of the contracts upon the basis of the doctrine of equitable estoppel.

█ Haveg argues, in any event, that there can exist no equitable estoppel unless by proof apparent authority of the person making the promise is established. We think to the contrary, however, for if proof of apparent authority is made then the cause of action is established by that proof, and the doctrine of equitable estoppel does not enter in. This is recognized by the Restatement of Agency 2d, § 88 in comment (b) and comment (c) where it is

stated that if neither authority nor ratification exists liability may be based upon estoppel if the plaintiff has changed his position.

■ As to whether or not the evidence was sufficient to justify the instructions, we think it was. Guyer's testimony was clear that he believed agents of Haveg had promised him two exclusive requirements contracts, and that in reliance upon that belief he had changed his position through the expenditure of time and money in developing the necessary equipment. There was evidence also that Haveg's agents and some of its officers knew that Guyer believed he possessed exclusive requirements contracts.

Haveg argues that the trial court erred in refusing to direct a verdict for it on the ground that there was no competent proof upon the issue of apparent authority. No complaint is made that the actual instruction given was erroneous as a matter of law. The argument is that there was no competent proof to warrant the instruction.

Basically the jury was instructed that if the acts of officers of Haveg or others in authority created a reasonable impression in the mind of Guyer that the agents with whom he actually dealt had authority to bind Haveg to an exclusive requirements contract, then Haveg would be bound to those contracts by reason of the apparent authority of those agents to so commit it.

Haveg relies primarily upon a ruling of the Superior Court in Colish v. Brandywine Raceway Ass'n, 10 Terry 493, 119 A.2d 887, to the effect that apparent authority may result from (1) the general manner in which a corporation holds out an officer or agent as having power to act, or (2) by acquiescence of the corporation in the acts of its agents with actual or constructive knowledge of them and their nature. We think this is a correct statement of the general rule.

■ The *Colish* case was a suit for repudiation of a contract by the defendant for the drawing of final plans for a harness racing plant. The issue in that case was whether or not two officers of a corporation had authority to bind the corporation to an unusual contract absent express authority given them to do so. The court expressly excluded the second category of acquiescence by a course of conduct because contracts of the type in question had never been entered into by either of the two officers before. At bar, however, Guyer argues that the course and nature of the dealings between him and Haveg over a period of time demonstrate that Haveg acquiesced in the exclusive requirements contract. We think there is sufficient in the record to permit the jury to find this as a fact. It was therefore properly submitted to the jury. We will give our reasons for this conclusion briefly.

On December, 1958, Guyer obtained from Haveg an exclusive requirements contract for serration work, or at least Guyer thought he had obtained such a contract. This was confirmed to Guyer by Anderson, then manager of the Haveg Division particularly concerned. Guyer was then told to work with the project engineer in the future. During the existence of the serration contract, Anderson became Vice President of Haveg. His position as division manager was taken by Quinn. Throughout the life of this contract, Guyer complained more than once to Anderson, then a vice president, and to Quinn, that he was not getting enough work under his exclusive requirements contract, although in fact he was getting 100%.

While the serration contract is not involved in this lawsuit, its existence is nevertheless of some importance because it established at least in Guyer's mind the belief that this was a customary way for Haveg to obtain its supplies for the missile program.

Thus, in January, 1960, when Guyer was approached by Haveg in connection with the bias slitting and sewing proposition, and in February, 1960, when he was approached

in connection with the chopping proposition, Guyer held the belief, which Haveg had done nothing to dispel, that it was not unusual for Haveg to bind itself to an exclusive requirements contract.

Furthermore, Guyer knew that it was imperative for Haveg to obtain a continuing source of supply for bias slitting and chopping in order for it to remain in the missile field. Since the emergency was for a continuing supply, it seems to us not wholly unreasonable for Guyer to believe that he was being asked to supply all of Haveg's requirements in the light of his experience with the serration contract. Particularly is this so when the project engineer with whom he had been instructed to work failed to make it clear that the proposal differed from the then-terminated serration contract.

Furthermore, we think, in the light of the testimony that all of Haveg's agents and officers concerned with the procurement of the material supplied by Guyer knew that he had claimed an exclusive requirements contract with respect to serration, we think there was a duty to point out to Guyer that such would not be given with respect to the slitting and chopping, if such was to be the fact. This particularly was so in view of Guyer's repeated claims made to the Haveg project engineer, its purchasing agents and its division manager that he held an exclusive requirements contract for slitting and chopping.

Under the circumstances, accepting Guyer's testimony as we must, we think there was sufficient in the record to require the submission to the jury of the issue of apparent authority.

Haveg argues that error was committed in denying its motion for a directed verdict on the ground that the contracts were too indefinite to enforce. The argument is that the term "requirements" is too indefinite to be legally enforceable and that no price had been fixed for the material to be supplied by Guyer.

We think, however, that the amounts of material required by Haveg were readily ascertainable by reference to what Haveg was required to do by reason of its contracts with others in the missile program. The amounts of slitting and chopping required by Haveg were not fixed by the indefinite desires of Haveg, but by the definite requirements of its contracts with others. See Coca-Cola Bottling Co. v. Coca-Cola Company, D.C., 269 F. 796.

As far as the price goes, there is sufficient testimony in the record which, if believed, establishes a definite price.

Haveg relies on Hindes v. Wilmington Poetry Society, 37 Del.Ch. 80, 138 A.2d 501, and General Electric Co. v. N. K. Ovalle, Inc., 335 Pa. 439, 6 A.2d 835, but we think the cases are not apposite. The *Hindes* case invalidated a contract for royalties for the reason that there was no provision in the contract fixing the amount of royalties. The *General Electric* case refused to enforce a provision for "such financial assistance as might be required" on the ground that there was no measure by which the requirement might be made definite. Obviously, neither case is in point in the case at bar.

The foregoing treatment of lack of definiteness, we think, is an answer to Haveg's fourth argument to the effect that the contracts in suit are unenforceable for want of certainty and mutuality.

For its fifth point, Haveg argues that there was no proof of a real promise by it to enter into an exclusive requirements contract with Guyer and, hence, that it was error to submit the case to the jury in reliance upon the doctrine of promissory estoppel.

The doctrine of promissory estoppel which will create a cause of action has two fundamental elements which must be proved by the plaintiff. First, there must be proof that there actually was a promise and, second, that the plaintiff relied upon

that promise and took action to his detriment. Metropolitan Convoy Corp. v. Chrysler Corp., Del., 208 A.2d 519.

Haveg argues that the promises made in the *Metropolitan* case, a decision of this court, were as unequivocal as the promises relied on by Guyer, and that since we held in the *Metropolitan* case that there were no actual promises to be relied on, we must make the same ruling in this case.

We think, however, the cases differ in proof. As we pointed out in the *Metropolitan* case, the alleged promises relied on in it were in reality only statements which the plaintiff assumed gave it an expectancy of future business. In the case at bar, however, if the testimony of Guyer is to be accepted, he was the recipient of an unequivocal promise that he would be asked to supply all the requirements of Haveg. As we pointed out in our discussion under the apparent authority argument, Guyer was entitled to rely on this promise.

 The issue was properly submitted to the jury.

For its sixth point, Haveg argues that it was error to have submitted the case to the jury because there was no proof that it breached the bias slitting and sewing contract. No contention is made with respect to the chopping contract. The argument is that a party is not justified in failing to perform his part of a contract by reason only of the fact that he reasonably believes that the other party is intending to break the contract. 6 Corbin on Contracts, § 1260. In essence, Haveg argues that Guyer and not it breached the contracts.

The facts, however, if Guyer's testimony is accepted, are to the contrary. On August, 14, 1962, Guyer received a letter from Haveg to the effect that it required large quantities of materials but was going to obtain them from another source by changing from bias slitting and sewing to bias slitting and bonding. Guyer knew that the bonding process was unsatisfactory and,

in fact, the writer of Haveg's August 14 letter so testified at trial.

Immediately following the receipt of the August 14 letter, Guyer was called by its writer, the division manager, and asked to bias slit and sew 800 pounds of material which Haveg at that time needed. Later, a Haveg purchasing agent told Guyer that he would receive only 200 pounds. Guyer demanded all 800 pounds, refused the 200 pounds and demanded that the exclusive requirements contract be reduced to writing. When this demand was rejected, Guyer treated it as a breach of the contract.

 We think that this testimony, if accepted, demonstrates a breach of contract by Haveg and complies with the rule.

Finally, Haveg argues that it was error to submit the case to the jury because the proof of damages was too speculative to permit the jury to pass upon it. Henne v. Balick, 1 Storey 369, 146 A.2d 394.

The argument is directed solely to the sufficiency of the evidence for the recovery of loss of profits under the contracts. It does not challenge the propriety of submitting to the jury the question of damages under the doctrine of equitable estoppel, i.e., the amount actually lost as a result of change of position.

What is the evidence? First, the gross amount under each contract is readily ascertainable. With respect to the bias contract, the amount is $17,152.40, the gross value of the bias work which Haveg caused to be performed by others. With respect to the chopping contract the gross amount is readily computed as 703,329 pounds x .45 = $316,498.05—both the total poundage and the price per pound being in the record.

The jury, of course, necessarily had to deduct from these gross figures Guyer costs so as to arrive at the lost net profit. With respect to the bias contract, this could be done by an allocation of a portion of his overhead for the years in question, which is

in the record, to the gross value to determine the net profit.

With respect to the chopping contract, the jury had before it Guyer's testimony that the chopping work would have required four additional employees. We think it would have been relatively easy for the jury to determine the cost of such additional employees and to allocate a portion of overhead to this contract work.

We think, therefore, that the issue of damages based upon loss of profits was not so speculative as to preclude its submission to the jury.

For the foregoing reasons, the judgment below is affirmed.