**Paul PRINCE, Appellant,**

**v.**

**MILLER BREWING COMPANY, Appellee.**

**No. 15358.**

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Oct. 17, 1968.

Rehearing Denied Nov. 21, 1968.

M. W. Parse, Jr., Dan G. Matthews, Houston, for appellant; Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, of counsel.

Alvin M. Owsley, Jr., Houston, for appellee; Baker, Botts, Shepherd & Coates, Houston, of counsel.

COLEMAN, Justice.

This is a suit by appellant seeking restitution for the money which he expended in the preparation for, and the operation of, a distributorship for Miller products, as well as a reasonable compensation for his labor, which he alleged were appropriated by the Miller Brewing Company by the wrongful termination of the relationship between it and appellant.

The case was tried to a jury, but at the conclusion of appellant's case, the trial judge entertained a motion for instructed verdict on three grounds: (1) that appellant had failed to establish a cause of action; (2) that the distributorship arrangement was expressly made terminable at will without liability; and (3) that the evidence conclusively established good cause for the termination of the contract. The trial judge sustained the motion, and the jury duly returned the verdict as instructed. From the judgment entered appellant has properly perfected his appeal. The facts hereinafter stated will be presented in the light most favorable to appellant.

In 1963 appellant owned 80% of the capital stock of Texas Gulf Distributing Company, the distributor of Miller High Life Beer and Carling Black Label Beer in Galveston, Texas. At that time Paul Giermann was manager of the local territory for Miller and Joe S. Signaigo was sales manager for Miller in Texas. Ed Schmidt was a representative of the Carling Brewing Company. Jacob Feigle was an employee of Texas Gulf Distributing Company and owned 10% of its capital stock.

In August, 1963, Giermann called appellant on the telephone and told him that he and Signaigo wanted to know if appellant would be interested in the Miller High Life distributorship in East Harris County. At their request appellant and his wife met with them on the same day in Baytown, Texas. At this meeting appellant was informed that the East Harris County territory included Baytown, South Houston, Pasadena, Clear Lake, NASA, Highlands and Northshore; that the area had been serviced poorly in the past and was run down. He was told that it would be two or three years before he could start realizing a profit out of the operation and that he would not break even until he reached a volume of 30,000 cases annually. He was told that he would be required to secure three trucks to service the area; that he would have to establish and maintain warehouse facilities comparable to those maintained by other beer distributors in the area; that he would have to move from Galveston to Baytown in order to devote full time to the business.

At the conclusion of the meeting Signaigo told him to go ahead and make arrangements for trucks, warehousing, permits, etc. as fast as desirable. Shortly thereafter, Signaigo recommended to appellee that appellant be appointed distributor stating that appellant felt that within two to three years he could build the market to a volume exceeding 30,000 cases annually.

After the meeting in Baytown appellant arranged to lease warehouse facilities, applied for the necessary permits and licenses, bought the necessary vehicles, offices and warehouse machinery and equipment and hired employees. In due time he received his appointment as distributor of Miller High Life Beer in the East Harris County territory and began operations about the First of October, 1963.

A written contract was executed by appellant and the proper officials of appellee. No attack is made on the contract. Appellant did not refer directly to the written contract in his pleadings. Appellee filed only a general denial. Appellee introduced the contract into evidence, and some of its significant provisions are:

"I understand the conditions of a Miller distributorship are as follows:

"Our mutual promises constitute the consideration for this understanding.

" * * *

"You will sell me Miller High Life beer for resale with the understanding that I will expend my best efforts in distributing and selling the same. Your prices to me will be the prices for the beer and returnable bottles (if so packaged) effective at the time of the acceptance of my orders. * * * The beer becomes my property and the risk of loss passes to me at the time of delivery of the beer to my truck or to a carrier for shipment to me. * * *

" * * *

"Nothing herein shall require you to accept any order I may place with you, nor to limit you in postponing the shipment of any order to me, and it is understood that you may make reasonable adjustments in the orders I may place to meet the limitations of or to fill railway cars or other conveyances used to ship the beer to me. Should you be prevented or delayed in the shipment of any order to me by reason of any act of God, riot, strike, work stoppage, fire, flood, machine or equipment failure or other such cause, performance on your part is excused to the extent of such prevention or delay.

"As is the custom in our industry, these sales to me are made on a shipment to shipment basis only. Either of us can terminate this relationship at any time without incurring liability to the other. If this relationship is terminated, it is understood that all my unfilled orders for beer are cancelled and you may stop and reclaim any beer in transit to me.

" * * *

"Should either of us terminate this relationship it is probable that I will have some Miller High Life beer on hand as well as some empty returnable bottles. I agree with you and you agree with me that should this happen that I will sell and you will purchase or arrange for another distributor to purchase any such beer that I may then have on hand for the net price which I actually paid you for the beer plus any local and state taxes I have paid thereon, plus the transportation charges I have paid to have the same shipped to my warehouse, plus any charges I have paid you for the returnable bottles of Miller High Life beer I may have on hand. * * *

" * * *

"Inasmuch as all rights granted me hereunder are to be regarded as personal rights granted me, I shall not assign any such rights without approval signed by two of your corporate officers. I understand also that I may not change the

nature of my sole proprietorship to a partnership or corporation, without securing your written approval thereto.

"My relationship with you does not change the fact that I am in an independent business or enterprise. Neither of us is in any sense to be regarded as the principal or agent of the other.

" * * *

"The terms of this application and the acceptance thereof will constitute our entire understanding and no representations or promises have been made by you or your representatives that are not herein fully set forth. It is to be interpreted according to the Wisconsin law. We mutually agree that if any of its provisions contravenes any applicable law, such provision or provisions shall be regarded as modified to the extent necessary to conform with such applicable law, it being our mutual intention to conform strictly with all applicable laws.

" * * *

"Should this application be accepted, the terms hereof cannot be modified or changed unless in writing signed by at least two corporate officers of the Miller Brewing Company."

The evidence established that during the last three months of 1963 appellant's sales averaged 1500 cases per month, for the year 1964 2500 cases per month, and for the first six months of 1965 3550 cases per month. He was assigned sales quotas by appellee and exceeded the assigned quotas for the years 1964 and 1965. The contract was terminated by appellee on June 25, 1965. In May, 1965, the operation showed a profit of $242.90.

Both appellant and his wife worked full time in their efforts to create a profitable market for appellee's product. Appellant was expected to, and did, expend considerable effort and expense to promote Miller High Life beer in his assigned area. There was evidence that he lost $6,271.40

in 1963, $10,454.28 in 1964, and $3,459.55 in 1965. These figures do not include losses on sales of fixed assets after termination of the contract or any compensation to appellant or his wife for the time and effort they spent building up the distributorship and the market for appellee's product.

After appellant was terminated, appellee appointed Don Faust distributor in the East Harris County area. His operation showed a continued and substantial increase in volume of sales.

A dispute arose between Texas Gulf Distributing Co. in Galveston and appellee resulting in litigation. Fourteen days before appellant was terminated in Baytown, there was a hearing on an application for a temporary injunction in that suit. In the course of that suit appellant testified that a few days, or weeks, prior thereto he learned that Mr. Feigle, who then was manager of the Galveston business, had, at the request of Mr. Giermann, in his sales report to appellee, included in a particular month sales made during the week prior to the month in question, as well as the week subsequent thereto, in order to secure S & H Green Stamps offered by appellee as a bonus. These stamps were divided with Mr. Giermann, and some of them given to appellant. At the hearing appellant testified that he was not going to dismiss Mr. Feigle or give back the Green Stamps which he had received. There was also testimony that after appellant's original conversation with Giermann and Signaigo, and about thirty days after he had been assured that he would get the distributorship, he had placed $1,000.00 cash in each of two envelopes addressed to Mr. Giermann and Mr. Schmidt and gave the envelopes to Feigle to give to them. He testified that this was done after Schmidt told him that he (Schmidt) thought that appellant owed them such a sum of money. He testified that Schmidt later told him that it would save a lot of time getting the deal and that he would not have to pay for a "bunch of stuff". Appellant said that they called it "good

will" and he gave them the money before he fully understood what it was for.

With reference to the Green Stamps Feigle testified that Giermann suggested the scheme to him and told him not to tell appellant, that Feigle asked him to divide the stamps with him as other distributors were doing, and that the Brewery knew what was going on and allowed it as an extra incentive to Giermann.

Appellant testified that he was told by Mr. Weinsheim that the reason he had been terminated in Baytown was because of the Galveston suit. Signaigo testified that he recommended the termination because of the facts that came to light during the hearing which he characterized as "a breakdown in honesty and integrity".

It is appellant's contention that he was a victim of extortion on the part of one of appellee's employees with respect to the $1,000.00 payment and that he knew nothing about the Green Stamps episode until he was already involved in litigation with appellee. He further states that these matters were revealed at the injunction hearing voluntarily by him. He contends that since the payment was made after the distributorship was promised him, the subsequent business relationship shows that he neither bargained for nor received any special favors from Giermann, and that there was no good cause for the termination of the distributorship.

■ Under the evidence reasonable men could differ as to whether the conduct of appellant was such as to constitute good cause for the termination of the business relationship. The question of good cause, therefore, became an issue of fact for submission to the jury.

It is appellant's contention that where a manufacturer and a distributor enter into an arrangement whereby the distributor is to develop a market for and sell the manufacturer's products, and it is contemplated by both parties that expenditures of time and money by the distributor are necessary to build up his distributorship, though the relationship be one terminable at will, the law will not allow the manufacturer to exercise its rights of cancellation with impunity, but will imply an obligation on its part to respond in damages sufficient to compensate the distributor for his expenditures made and losses incurred in reliance upon the agreement if the manufacturer terminates the distributorship before the distributor is afforded a reasonable time to recoup his losses, and that the question of reasonable time is a fact issue for the jury. This statement of the law is supported by respectable authority. Gibbs v. Bardahl Oil Company, 331 S.W.2d 614 (Mo.1960); White Company v. W. P. Farley & Co., 219 Ky. 66, 292 S.W. 472 (1927); 2 Am.Jur., p. 46, Agency, Sec. 50.

In Gibbs v. Bardahl Oil Company, supra, the court said:

"While defendant's answer was a general denial, there was evidence from which a jury could find that both parties to this action signed the 'Distributor's Territory Franchise and Promotional Sales Program' agreement. In effect its execution is conceded, since appellant relies on its provisions for termination as constituting a complete defense to this action. However, that agreement expressly provided that the termination of the distributorship should not relieve the distributor from existing financial obligations and it must be implied, as a part of the agreement, as certain and definite as if it had been stated in so many words, that, if the distributor in good faith undertook to fully perform the contract on his part and if he expended work, labor and money in so doing, a termination of the relationship would not discharge any obligation of the manufacturer to the distributor which had accrued prior to such termination. It must further be implied from the provisions of said agreement that the manufacturer (appellant) would not cancel the franchise and terminate the relationship

for the purpose and with the intent to appropriate the benefits of respondent's work, labor and investment before respondent had had a reasonable time to recoup the benefit of his work, labor and expense. We cannot construe the provisions of the agreement with reference to termination as necessarily implying that upon the termination of the distributorship under the circumstances here shown the appellant could retain and appropriate without liability that portion of respondent's investment of labor and expenses which respondent had not had a reasonable opportunity to recoup by way of commissions."

Appellant also cites in support of his statement of the applicable law cases such as: Sanchez v. Crandon Wholesale Drug Co., 194 So.2d 646 (Fla., Dist.Ct. of App., 1967); Des Moines Blue Ribbon Distributors, Inc. v. Drewrys Limited, U.S.A., Inc., 256 Iowa 899, 129 N.W.2d 731 (1964); Florida-Georgia Chem. Co. v. National Laboratories, 153 So.2d 752 (Fla., Dist.Ct. of App., 1963); General Tire and Rubber Company v. Distributors, Inc., 253 N.C. 459, 117 S.E.2d 479 (1960); Allied Equipment Co. v. Weber Engineered Products, 237 F.2d 879 (4th Cir. 1956); Terre Haute Brewing Co. v. Dugan, 102 F.2d 425 (8th Cir. 1939); Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624 (1938).

■ While generally these cases support the proposition of law presented, each of these cases presented situations where the contract was oral, of indefinite duration, 'or void, and were considered cancellable at will as a matter of law. There was no specific written agreement authorizing cancellation without liability. In these cases the court implied an obligation on the part of the party exercising the right to cancel to restore the status quo, or to make reasonable compensation to the other party for services already performed.

The court, in Gibbs v. Bardahl Oil Company, supra, recognized another line of authority, which appears to be applicable to the case at bar, when it said:

"Appellant has cited numerous authorities in support of the proposition that 'a contract of agency containing a provision authorizing its cancellation by either party upon notice is terminable by the principal in accordance with such provision *and a termination in pursuance* of such a provision will impose no *liability upon the principal.*' (Italics ours.) Appellant cites Mechem on Agency (Second Edition), Vol. 1, Sec. 557; Bendix Home Appliances, Inc. v. Radio Accessories Co., 8 Cir., 129 F.2d 177; Bushwick-Decatur Motors, Inc., v. Ford Motor Co., 2 Cir., 116 F.2d 675; Buggs v. Ford Motor Co., 7 Cir., 113 F.2d 618; General Electric Co. v. N. K. Ovalle, Inc., 335 Pa. 439, 6 A.2d 835; 2 C.J.S. Agency § 74, pages 1154-1156. " * * *

"While the authorities cited, supra, support the abstract statement of law relied upon by appellant, we do not find them applicable to the issue presented in this case."

In Fargo Glass & Paint Co. v. Globe American Corporation, 161 F.2d 811 (7th Cir. 1947), the court followed Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, and Terre Haute Brewing Co. v. Dugan, 102 F.2d 425 (8th Cir. 1939). It distinguished Bushwick-Decatur Motors v. Ford Motor Co., 116 F.2d 675 (2nd Cir. 1940), and Buggs v. Ford Motor Co., 113 F.2d 618 (7th Cir. 1940), on the grounds that the contract provisions for cancellation controlled not only the future rights of the parties, but also transactions that had occurred before cancellation. The court also pointed out that the contracts in the latter cases contemplated the sale of goods to the plaintiffs which they were to resell and were not contracts of hiring or agency.

■ The Texas courts have always permitted parties dealing at arms' length freedom to contract as they see fit, and

enforce the contracts in the absence of fraud. Golden State Mutual Life Insurance Co. v. Kelley, 380 S.W.2d 139 (Tex. Civ.App., 1st Dist., 1964, refused, n. r. e.). The courts of this State adhere to the rule that prior negotiations of parties to written contracts, complete in themselves and unambiguous, are, in the absence of fraud, accident or mistake in their omission from the written contract, merged in the writing. Jones v. Chester, 363 S.W.2d 150 (Austin Civ.App.1962, writ den., n. r. e.).

In Wood Motor Co., v. Nebel, 150 Tex. 86, 238 S.W.2d 181 (1951), our Supreme Court said:

"What the contract says is that 'certain other conditions' may create a desire on the part of either party to terminate the contract. If that desire is created, then the right to terminate by giving the prescribed notice is unqualified. Section 9 does not provide that the agreement may be terminated by notice if conditions warrant it or if a just cause for termination exists. It simply provides that it may be terminated by notice if either party so desires. There being no ambiguity in the language of the contract, resort to rules of construction is not permissible. Many authorities are cited in the briefs, but we think it quite sufficient to cite the following: Maddox Motor Co. v. Ford Motor Co., Tex. Com.App., 23 S.W.2d 333; Goodwin Bros. v. Cook, 307 Ky. 646, 212 S.W.2d 126; Cadillac La Salle Co. of Palm Beach v. Claude Nolan, Inc., 118 Fla. 250, 158 So. 883; Martin v. Ford Motor Co., D.C., 93 F.Supp. 920.

"Under respondents' theory they could terminate the contract at any time with or without notice, while petitioner could not terminate it even with notice, unless a jury or judge should hold that a good cause existed therefor. Under our view, to support that theory would be to make a contract for the parties and deny to them the valuable right to contract for themselves. Long ago Sir George Jessel wrote: '* * * if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.' Printing and Numerical Registering Co. v. Sampson, 19 L.R., Equity, 462, 465."

In Haley v. Nickels, 235 S.W.2d 683 (Austin, Tex.Civ.App.1950, n. w. h.), the court said:

"The parties could, by their contract, agree that the same might terminate at the election of one or the other of them and the agreement may be enforced if fairly made and the same is not contrary to equity and good conscience. And, unless otherwise provided the status quo of the parties need not be restored. Maddox Motor Co. v. Ford Motor Co., Tex. Com.App., 23 S.W.2d 333; Gable v. Frigidaire Corp., Tex.Civ.App., 121 S.W.2d 456, Er.Dis.; 17 C.J.S. Contracts §§ 399 and 401, pages 888 and 891."

In Gable v. Frigidaire Corporation, 121 S.W.2d 456 (El Paso, Tex.Civ.App.1938, writ dism.), the court said:

"The agreement provides for its termination by cancellation or termination by either party, with or without cause, at any time by giving notice, and that the Seller may, at its option, repurchase any or all of the products on hand in his place of business or in possession of the dealer. Appellant contends that the agreement as to the right of repurchase is unenforceable for lack of mutuality. But a contract cannot be unilateral in part and bilateral in part; it is one or the other. There an order was given by appellant and accepted by appellee and part payment made. This was under the con-

tract. Big Four Ice & Storage Co. v. Williams, Tex.Civ.App., 9 S.W.2d 177, and the cases there referred to, settles the question against appellant's contention. * * *

"* * *

"In what we have said we have assumed that the contract lacked mutuality at the time when made, as contended by appellant. But taking the contract as a whole we doubt whether it is lacking in mutuality. Appellant submits that because he incurred expense in the employment of additional salesmen and advertising, upon the expectation that the refrigerators ordered would be delivered, appellee should be estopped to claim that it had cancelled the contract. Appellant had notice by the contract of appellee's unqualified claim of right to cancel the contract by giving notice of its intention to cancel."

We note that in Wood Motor Co. v. Nebel, supra, as well as Maddox Motor Co. v. Ford Motor Co., 23 S.W.2d 333 (Tex. Com.App.1930, [on subsequent appeal, Ford Motor Co. v. Maddox, 123 Tex. 608, 73 S.W.2d 517 (1934)], cited therein, the causes of action were for damages for breach of contract, and that in both cases the court says that the option to terminate will be enforced "if not contrary to equity and good conscience." Under the facts of this case it would appear that a jury issue has been raised as to whether the contract termination was "contrary to equity and good conscience." Appellant, however, did not sue on the contract and has not raised this point in his brief in this context. There is no pleading that the contract was not properly cancelled under the provision for cancellation contained therein. There is no pleading raising the issue of a fraudulent exercise of the right to cancel the contract. Appellant does not seek damages for breach of the contract on the part of appellee.

In Wheeler v. White, 398 S.W.2d 93 (Tex.1965), the Supreme Court recognized the case of Goodman v. Dicker, 83 U.S. App.D.C. 353, 169 F.2d 684 (1948) as authoritative in a situation where one, relying on a promise that a franchise would be granted, incurred expenses in making preparations to engage in the business. There the reliance damage was allowed when the manufacturer failed to grant the franchise. Our Supreme Court said:

"The Court in the Goodman case, in refusing to allow damages based on a loss of anticipated profits, apparently acted in harmony with the theory that promissory estoppel acts defensively so as to prevent an attack upon the enforceability of a contract. Under this theory, losses of expected profits will not be allowed even if expected profits are provable with certainty. The rule thus announced should be followed in the present case. We agree with the reasoning announced in those jurisdictions that, in cases such as we have before us, where there is actually no contract the promissory estoppel theory may be invoked, thereby supplying a remedy which will enable the injured party to be compensated for his foreseeable, definite and substantial reliance. Where the promisee has failed to bind the promisor to a legally sufficient contract, but where the promisee has acted in reliance upon a promise to his detriment, the promisee is to be allowed to recover no more than reliance damages measured by the detriment sustained. Since the promisee in such cases is partially responsible for his failure to bind the promisor to a legally sufficient contract, it is reasonable to conclude that all that is required to achieve justice is to put the promisee in the position he would have been in had he not acted in reliance upon the promise. See Goodman v. Dicker, supra; Terre Haute Brewing Co. v. Dugan, 102 F.2d 425 (C.C.A. 8th, 1939); Kearns v. Andree, 107 Conn. 181, 139 A. 695, 59 A.L.R. 599 (1928); Fuller and Perdue, The Reliance Interest in Contract Damages, 46 Yale L.J. 52 (Part I) and 373 (Part II) (1937); note 13 Vand.L.Rev. 705 (1960);

and note 59 Dickinson L.Rev. 163 (1954)."

In this case, however, there is a legally sufficient contract. Appellant was fully aware of the provision permitting cancellation without liability. Appellant cannot disregard the contract and sue for his reliance damage. Because of the valid contract the theory of promissory estoppel is not applicable. In the absence of a recision of the contract a cause of action grounded on the principles of restitution is not available. See Reliance Interest in Contract Damages, 46 Yale Law Journal 52 (Part I) and 373 (Part II) at p. 416; Corbin on Contracts, Vol. 6, § 1266.

The following quotation from Bushwick-Decatur Motors v. Ford Motor Co., 116 F.2d 675 (2d Cir. 1940) is pertinent on the facts of this case:

"With a power of termination at will here so unmistakably expressed, we certainly cannot assert that a limitation of good faith was anything the parties had in mind. Such a limitation can be read into the agreement only as an overriding requirement of public policy. This seems an extreme step for judges to take. The onerous nature of the contract for the successful dealer and the hardship which cancellation may bring him have caused some writers to advocate it, however; and an occasional case has seized upon elements of overreaching to come to such a result on particular facts. See, for example, Philadelphia Storage Battery Co. v. Mutual Tire Stores, 161 S.C. 487, 159 S.E. 825; the criticism of this case in 45 Harv.L.Rev. 378 and the answering arguments in 17 Corn.L.Q. 479 (and see also 31 Col.L.Rev. 830, 840, 842) well indicate the opposing views. But, generally speaking, the situation arises from the strong bargaining position which economic factors give the great automobile manufacturing companies; the dealers are not misled or imposed upon, but accept as nonetheless advantageous an agreement in form bilateral, in fact one-sided. To attempt to redress this balance by judicial action without legislative authority appears to us a doubtful policy. We have not proper facilities to weigh economic factors, nor have we before us a showing of the supposed needs which may lead the manufacturers to require these seemingly harsh bargains."

The Trial Court did not err in instructing the jury to return a verdict for the appellee, and in entering a judgment based thereon.

Affirmed.