A. H. GIBBS, Plaintiff-Respondent,

v.

BARDAHL OIL COMPANY, a Corporation, Defendant-Appellant.

No. 47263.

Supreme Court of Missouri,

Division No. 1.

Jan. 11, 1960.

Rehearing Denied Feb. 8, 1960.

David E. Horn, St. Louis, for appellant.

Ralph H. Schnebelen, St. Louis, for respondent.

DALTON, Judge.

By this action plaintiff seeks to recover a judgment against defendant for $25,000, being the alleged reasonable value of plaintiff's services to defendant, as rendered under the circumstances hereinafter stated. Verdict and judgment were for defendant, but the court set the judgment aside and granted plaintiff a new trial on the ground that the court erred in giving Instruction No. 4, requested by defendant. Defendant has appealed and here contends that "Instruction 4 correctly stated the law applicable to the facts of this case" and that the court erred in granting plaintiff a new trial.

Plaintiff's petition alleged that he was engaged in the distribution and sale of defendant's products in Central America and Mexico; that he was granted a franchise by defendant and authorized to sell and promote the sale of defendant's products in said countries; that, while engaged in such sales and promotion work, he obtained the services of subdistributors and salesmen, expended large sums of money in such sales and promotion work and developed a market for defendant's products in said countries; that defendant and its agents conspired with the agents of plaintiff in said countries for the purpose of taking over the business and good will developed by plaintiff in said countries; and that defendant employed plaintiff's agents and representatives and supplied them with its products for sale and refused to supply plaintiff with its products, terminated plaintiff's agency and eliminated plaintiff from the business established by him in said countries. Plaintiff sought to recover the reasonable value of the services so rendered in the sale, promotion and distribution of defendant's products in the countries assigned to him, prior to the cancellation of his agency.

By his pleadings and evidence plaintiff sought to bring his case within the rule stated in Glover v. Henderson, 120 Mo. 367, 25 S.W. 175, 177, and followed in Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, 629, as follows, to wit, that "where an agent is employed to perform an act which involves expenditure of labor and money before it is possible to accomplish the desired object, after the agent has in good faith incurred expense and expended time and labor, but before he has had a reasonable opportunity to avail himself of the results of this preliminary effort, it could not be permitted that the principal should then terminate the agency, and take advantage of the agent's services, without rendering any compensation therefor." And see 2 Am.Jur. p. 46, Agency Sec. 50; 2

C.J.S. Agency § 90, p. 1181; 3 C.J.S. Agency § 187, p. 88.

Plaintiff's evidence, consisting of oral testimony and some documents including letters, tended to show that plaintiff in 1949, first discussed with defendant's representative (Knox) the matter of promoting the sale of Bardahl Oil Company products in "Latin America" for which he "was not to be paid anything by the company or by Knox," but he was "to work only on" a ten per cent commission basis. He was later advised in writing that "We will work with you one hundred per cent on the promotion of Bardahl in Latin America, because we have no idea of how to handle the foreign export business." This first agreement did not include Mexico, but plaintiff entered upon his work and began to set up distribution outlets on the basis mentioned. He wrote letters, made trips and telephone calls and expended money. Thereafter, on February 15, 1950, defendant offered plaintiff a "distributor's agreement covering Central America" and plaintiff signed and returned the document to defendant. It was styled, "Distributor's Territory Franchise and Promotional Sales Program" and it provided in part, as follows:

"This written Promotional Sales Program, between the Bardahl Oil Company of St. Louis, Missouri, and the undersigned distributor of its manufactured products, is not intended as a legally enforceable contract, but to express the intent of the Bardahl Distributor's Sales Program which has as its aim the promotion, distribution, and sale of the Bardahl Oil Company products, for mutual satisfaction and profit.

"The parties are hereby trying to formulate a plan of co-operative effort to promote the distribution and sale of the Manufacturer's products on a basis of unselfish cooperation, complete understanding and harmonious relationship between themselves and the Dealers as well, in furtherance of the business and profit of them all. With this intent and purpose the parties are expressing their plan in this written agreement and it is understood and agreed between the parties as follows:

"(1) That the Manufacturer will furnish to the Distributor the following of its products, namely, Bardahl Oil and Greases in the quantities of each desired as conditions permit. * * *

"(3) That the Distributor in a general way shall have territory protection within the area described below, that is, the Manufacturer will to the best of their ability protect each territory boundaries from being crossed by the adjoining distributor. * * * Central America. * * *

"If either the extent or the indicated sales possibilities therein shall be such as to prompt the Manufacturer to so request, the Distributor will associate with himself one or more sub-jobbers and salesmen in order to properly cover the area with adequate Dealer distribution and satisfactory sales volume. Choice, number and location of any such jobbers shall be by the mutual agreement of the Manufacturer and Distributor. * * *

"(1) The Distributor agrees to carry such stock of the Manufacturer's products sufficient to promptly supply the immediate needs of his Dealers.

"(2) The Distributor agrees to furnish personnel capable of being trained in the selling of the Manufacturer's products, and to train and assist Dealers in the selling thereof. It is thought that Distributor's sales meetings and Dealers' meetings at regular intervals in the Distributor's headquarters will be helpful in furthering the mutual interests of all concerned, and it is contemplated that the Manufacturer's rep-

resentative will assist with such meetings.

"(3) The Distributor will also permanently identify his firm and its representation of the Manufacturer's products throughout his territory, using every reasonable method such as, accepted forms of advertising, Dealer displays, etc., and will at all times exercise his best efforts and diligence to promote and expand the sale of the Manufacturer's products. * * *"

The document contains no provisions as to commissions or terms of the agency. It was signed by both plaintiff and defendant and contains a final paragraph as follows:

"(6) Either party desirous of cancelling the relationship may do so on thirty days' notice in writing. But no such cancellation shall relieve the distributor of existing financial obligations. Both parties agree to conscientiously adhere to the spirit and purpose of the plan as herein expressed."

Plaintiff testified that "Central America" covered British Honduras, Guatemala, San Salvador, Nicaragua, Costa Rica, Honduras and Panama. After the Promotional Sales Program document was signed, the plaintiff carried on sales and promotional work for defendant in accordance with the plan set forth therein. Defendant also printed letterheads for plaintiff, holding plaintiff out to be its Latin America Representative, to wit, "A. H. Gibbs, Distribuidor Exclusivo Para Latino America. Direccion Postal Apartado No. 51."

In June 1950 plaintiff was notified by letter that he had been given the distributorship for Mexico and plaintiff set up a distributor there, who put in several subdistributors. The volume of business increased rapidly and plaintiff proceeded with the distribution of Bardahl products in Mexico. Plaintiff made two trips to Mexico for defendant and in the summer of 1951 plaintiff made two trips to Venezuela and one to Cuba at the request of defendant.

Plaintiff testified at length as to what he did to sell and promote the sale of defendant's products and how expenses were incurred. He testified that he spent between three and four thousand dollars of his own money promoting the sale of defendant's products.

Other evidence tended to show that in August 1951, Mr. Fuch, President of defendant corporation, made a trip to Mexico and contacted a Mr. Meillon, the distributor set up and selected by plaintiff and, in September 1951, defendant terminated plaintiff's distributorship. The termination became effective in May 1952. Various reasons were assigned by defendant for the termination of plaintiff's distributorship, to wit, that "the delays in shipment, shipping charges, duties, damage to shipments, special packaging, additional paper work, etc., has resulted in being priced out of these markets by competition." The letter further stated: "Also, under our present setup, it is not practical to meet the demand for lithographed cans and literature in Spanish. * * * Until the Mexican plant is completed and in operation, you will continue to act as our exporter as you have in the past and at the same percentage. At this writing, it is difficult to say just when the Mexican plant will be finished and in operation." Mr. Fuch, the president of the defendant corporation, formed a company in Mexico with Mr. Meillon to take over the distribution of Bardahl products in Latin America. Plaintiff admitted that all of the commissions that he had coming to him on the basis of shipments that went into his territory, for as long as it was his territory, had been paid. These commissions amounted to "around $5,000." Plaintiff was at all times engaged in the general export business from 1949 to 1952, selling general merchandise, particularly to Guatemala and San Salvador, as well as representing the defendant as herein stated. Other evidence tended to show that the services rendered

by plaintiff for the defendant in Central America and Mexico were reasonably worth from $15,000 to $20,000 per year.

For defendant, defendant's president testified that in August 1951 he was not satisfied with the sales generated by or through plaintiff; that he went to Mexico and surveyed the situation there with reference to setting up a plant in Mexico City; that upon his return to St. Louis about September 10, 1951 he decided to go ahead with the plant; and that he so notified plaintiff by the letter of September 10, 1951. A Mexican plant was formed to handle the entire operation of blending the concentrate and oil, packaging the finished product in cans, using Spanish language upon them, and selling the finished product. The Mexican plant went into operation in May 1952. Commissions on all sales in Central America and Mexico were paid to plaintiff to that date. Defendant's evidence tended to show that from November 1949 through May 20, 1952, the plaintiff bought $3,867 worth of defendant's products which he resold, adding his commission to the cost price; and that plaintiff received from defendant $2,350 in commissions on products shipped to customers by defendant on plaintiff's orders.

Plaintiff's Instruction No. 1, purported to submit the cause on plaintiff's theory of the case as hereinbefore mentioned. The instruction concluded as follows: " * * * and if you further find and believe from the evidence that when defendant Bardahl Oil Company terminated the plaintiff's exclusive distributorship in Central America and Mexico, if you so find, the plaintiff had not had a reasonable time to recoup his expenses and to receive a reasonable value for his work and services on behalf of the defendant; then, if you so find, you shall find the issues joined in favor of the plaintiff and against the defendant."

Instruction No. 2, in the event of a finding for plaintiff, authorized an award to plaintiff of "such sum, if any, as you may find and believe from the evidence the plaintiff reasonably expended in promoting defendant's products and in establishing distributors, and such sum, if any, as you may find and believe from the evidence would constitute the reasonable value of plaintiff's work and services on behalf of the defendant, less the sum which plaintiff received from the defendant as commissions, not, however, to exceed Twenty-Five Thousand ($25,000) Dollars."

Instruction No. 4, given at defendant's request, submitted a finding "that on or about February 15, 1950, defendant Bardahl Oil Company and plaintiff A. H. Gibbs entered into a written arrangement for the sale and distribution of defendant's oil products and that such written arrangements, if you so find, contained a provision stating: 'Either party desirous of cancelling the relationship may do so on thirty days' notice in writing,' and if you further find and believe from the evidence that on or about September 12, 1951, defendant gave and plaintiff received notice in writing that defendant had decided to establish a plant in Mexico * * * and that when such plant was in operation, plaintiff's services would no longer be required * * * that such plant was established and did go into operation more than thirty days after said written notice given on or about September 12, 1951, * * * that defendant paid to plaintiff ten per cent of the sales price of all defendant's oil products sold by defendant in Central America and Mexico to the date of the defendant's plant in Mexico going into operation * * * then your verdict must be for defendant Bardahl Oil Company."

While the instruction refers to "a written arrangement," appellant's brief admits that "the Distributor's Territory Franchise and Promotional Sales Program, offered in evidence * * * did not constitute the entire arrangement which established the relationship between appellant and respondent"; that "such document did constitute a written part of the arrangements between appellant and respondent"; and that "such

relationship arose also out of conversations and letters." Appellant further points to the provision in the mentioned document with reference to the termination of the relationship "on thirty days' notice in writing" and relies on respondent's admission that, when he signed this document, he realized that "upon thirty days' written notice they could cut me out." Appellant then argues that, in the letter of September 10, 1951, appellant explained the conditions and competitive situation which resulted in its decision to put in operation a plant in Mexico to handle its entire operations; that respondent was informed his services would not be needed when the plant went into operation; that in subsequent letters respondent admitted that he understood his services were being terminated, but said he was interested in continuing to represent appellant until the Mexican plant went into operation; that by so doing "respondent gave his assent to an indefinite date of final termination of his relationship"; that the Mexican plant did not begin operation until May 1952, a date eight months (instead of 30 days) removed from the date of the notice of cancellation; and that all commissions on all sales made in respondent's territory were paid to him until the Mexican plant began operation. On the basis of the foregoing facts appellant contends "that it had a right to cancel its relationship with respondent; that it did so in accordance with the terms of such relationship; and that such cancellation imposed no liability upon appellant other than the payment of the commissions which it paid to the time of the opening of its Mexican plant."

Appellant admits that Instruction No. 4, "authorized a verdict for appellant if appellant terminated its relationship with respondent in accordance with the terms of such relationship and paid respondent's commissions to the date of such termination." [As stated, respondent admits that appellant paid all of the commissions that respondent had coming to him according to shipments that went into respondent's territory as long as it was respondent's territory.]

Appellant has cited numerous authorities in support of the proposition that "a contract of agency containing a provision authorizing its cancellation by either party upon notice is terminable by the principal in accordance with such provision *and a termination in pursuance of such a provision will impose no liability upon the principal.*" (Italics ours.) Appellant cites Mechem on Agency (Second Edition), Vol. 1, Sec. 557; Bendix Home Appliances, Inc. v. Radio Accessories Co., 8 Cir., 129 F.2d 177; Bushwick-Decatur Motors, Inc., v. Ford Motor Co., 2 Cir., 116 F.2d 675; Buggs v. Ford Motor Co., 7 Cir., 113 F.2d 618; General Electric Co. v. N. K. Ovalle, Inc., 335 Pa. 439, 6 A.2d 835; 2 C.J.S. Agency § 74, pages 1154–1156.

Appellant further says that the word "right," as used in connection with "the right to revoke an agent's authority," "implies that no liability is entailed in its exercise"; and that such word "is to be distinguished from just the 'power' to revoke, which under certain circumstances involves liability upon him who uses it." Appellant contends that the inclusion of the cancellation provision in the arrangements between appellant and respondent conferred upon appellant the "right" of revocation (without liability) as distinguished from only the "power" to revoke which it would have had in the absence of any provision relating to termination.

While the authorities cited, supra, support the abstract statement of law relied upon by appellant, we do not find them applicable to the issue presented in this case. Further, appellant says that the case of Beebe v. Columbia Axle Co., supra, (where an agent was permitted, after cancellation of his contract, to recover the reasonable value of his services and expenses in prosecuting his principal's business above what he earned, where his agency was terminated before he had had a reasonable time in which to recoup such reasonable value) is

to be distinguished from the present case because in that case the contract was silent as to its termination and in that case the principal was held to have had the "power," but not the "right" of revocation so as to escape the liability imposed upon it. The case cannot be distinguished on that basis.

Respondent's action is not an action for damages for breach of any contract by untimely cancellation. The cancellation of the contract by written notice is admitted and the right of cancellation is fully conceded. There is no contention that the cancellation, as such, imposed any liability upon the defendant and respondent admits that all commissions were paid to the date of cancellation. The termination of the relationship of principal and agent is conceded. Upon a favorable view of the facts shown in evidence respondent seeks to recover the reasonable value of his services in excess of commissions paid.

We have seen that the agreement entitled "Distributor's Territory Franchise and Promotional Sales Program," after providing for cancellation, provided that "no such cancellation shall relieve the distributor of existing financial obligation," and it is the position of respondent that the cancellation of the relationship by defendant also failed to relieve the defendant from any obligations to respondent which the law implied from the facts and circumstances existing at the time of the cancellation.

Respondent's position more clearly appears from the statement in 2 Am.Jur., p. 46, Agency, Sec. 50, as follows:

"Although a principal may have the right to cancel an agency contract by virtue of an express reservation in that contract, without becoming liable for the breach of it, he may, upon cancelation, become liable to the agent for rights that have already accrued at the time of cancelation. When the agent has partially performed his part of the contract at the time of revocation, the principal is required to place the other in statu quo; that is, he must not cancel it so as to affect injuriously any rights that have already accrued to the other in its partial execution. An action in quasi contract may lie for services performed for the benefit of the principal though the principal may have revoked or canceled the agency in accordance with his rights under the express terms of the agency contract. * * *"

There is no assignment here by appellant as there could have been, that plaintiff failed to make a case for the jury or that the court erred in granting a new trial to plaintiff because plaintiff failed to make a submissible case. See Rose v. Thompson, 346 Mo. 395, 141 S.W.2d 824, 830(8); Adair County v. Urban, Mo.Sup., 250 S.W. 2d 493; Nelson v. Kansas City, 360 Mo. 143, 227 S.W.2d 672, 674. However, the question of whether a submissible case was made is "inherent in every case that comes to an appellate court" (Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73, 77) and, if the respondent in the case under consideration here made a case for the jury on the theory submitted by plaintiff's Instruction No. 1, then it is plain that Instruction No. 4 was erroneous and the court did not err in granting plaintiff a new trial for error in giving Instruction No. 4, which directed a verdict for defendant upon a finding of the facts submitted therein.

In the case of Glover v. Henderson, supra, 25 S.W. 175, 177, the court said: "The first question is whether this action is quantum meruit, for services rendered and reasonable expenses incurred, as claimed by the plaintiff, or whether it is an action for damages for breach of contract. * * *

"The contract in question was one of agency, so that we are brought to the question whether defendant, having revoked the agency, is liable to the plaintiff for the value of services rendered and

expenses incurred up to the date of revocation. There is and can be no claim made in this case that plaintiff had conferred upon him a power coupled with an interest. And, as he had no interest in the subject-matter of the agency, the principal had the power, and, in a qualified sense, the right, to revoke the agency at his will. State ex rel. Walker v. Walker, 88 Mo. 279; Mechem, Ag. § 204. But the question of the liability of the principal to the agent for services rendered is another and a different thing from the power, or even right, to terminate the agency. Contracts of agency are numerous, and widely variant in their objects, purposes, and terms; so that the question of compensation of the agent, when the agency has been revoked by the principal, will depend upon a variety of circumstances. * * * Although a contract, on its face and by its terms, appears to be obligatory on one party only, yet, if it was the manifest intention of the parties that there should be a correlative obligation on the other party, the law will imply such obligation. * * * The question, after all, is one of intention, to be gathered from the tenor and all the terms of the contract, considered in the light of the subject-matter of which the contract treats." And see Beebe v. Columbia Axle Co., supra, 117 S.W.2d 624, 629(4).

■ While defendant's answer was a general denial, there was evidence from which a jury could find that both parties to this action signed the "Distributor's Territory Franchise and Promotional Sales Program" agreement. In effect its execution is conceded, since appellant relies on its provisions for termination as constituting a complete defense to this action. However, that agreement expressly provided that the termination of the distributorship should not relieve the distributor from existing financial obligations and it must be implied, as a part of the agreement, as certain and definite as if it had been stated in so many words, that, if the distributor in good faith undertook to fully perform the contract on his part and if he expended work, labor and money in so doing, a termination of the relationship would not discharge any obligation of the manufacturer to the distributor which had accrued prior to such termination. It must further be implied from the provisions of said agreement that the manufacturer (appellant) would not cancel the franchise and terminate the relationship for the purpose and with the intent to appropriate the benefits of respondent's work, labor and investment before respondent had had a reasonable time to recoup the benefit of his work, labor and expense. We cannot construe the provisions of the agreement with reference to termination as necessarily implying that upon the termination of the distributorship under the circumstances here shown the appellant could retain and appropriate without liability that portion of respondent's investment of labor and expenses which respondent had not had a reasonable opportunity to recoup by way of commissions. Appellant's letter of September 10, 1951, in effect recognized that respondent had an investment under the contract in excess of commissions paid, when it added a self-serving statement as follows: "Inasmuch as we eventually would have been forced to discontinue selling in these markets under our present distribution setup, your loss in exporter's fees would have materialized, regardless of our decision to erect a Mexican packaging plant."

■ We think the evidence was sufficient for the jury to infer and find that, after respondent had in compliance with the terms of his agreement necessarily expended work, labor and money to promote appellant's products and in establishing distributors for appellant's products, the appellant cancelled respondent's franchise, terminated the relationship and retained and appropriated the benefit of respondent's work, labor and expense in promoting the sale of appellant's products and establishing distributorships before respondent had had a reasonable time within which to recoup his expenses and receive a reasonable value for his work and services. Under such circumstances the law would

622

imply an obligation on the part of appellant to pay the reasonable value thereof to the extent mentioned and respondent would be entitled to recover accordingly. Beebe v. Columbia Axle Co., supra, 117 S.W.2d 624, 629(4–6); Glover v. Henderson, supra, Royal Remedy & Extract Co. v. Gregory Grocer Co., 90 Mo.App. 53, 59. And see Superior Concrete Accessories v. Kemper, Mo.Sup., 284 S.W.2d 482, 491; Ehrlich v. Aetna Life Ins. Co., 88 Mo. 249, 257; Meyer v. Pulitzer Pub. Co., 156 Mo.App. 170, 136 S.W. 5, 7(4); Terre Haute Brewing Co. v. Dugan, 8 Cir., 102 F.2d 425, 427; 2 Am.Jur., p. 46, Agency Sec. 50; 2 C.J.S. Agency § 90, p. 1181.

Plaintiff's evidence was sufficient under the above authorities to make a submissible case for the jury on plaintiff's theory of the case. It follows that Instruction No. 4 was clearly erroneous and the court did not err in granting plaintiff a new trial.

By this opinion we do not intend to approve or disapprove the form of plaintiff's Instructions No. 1 and 2.

The order granting a new trial to plaintiff is affirmed.

All concur.