Margitta DI GENNARO and Core Products Europe, Inc., A Florida corporation, Plaintiffs,

v.

RUBBERMAID, INC., An Ohio corporation, Defendant.

No. 99–1989–CIV.

United States District Court, S.D. Florida, Miami Division.

Aug. 12, 2002.

David Finger, Frank H. Alvarez, Levine & Finger, Miami, FL, for plaintiffs.

Robert B. Galt, III, Gregg J. Brietbart, Jonathan B. Morton, Kirkpatrick & Lockhart, Miami, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, District Judge.

Pursuant to the requirements of Fed. R.Civ.P. 52, the following facts and conclusions of law are made. In this case, Margitta Di Gennaro and Core Products Europe, Inc. ("Di Gennaros"), have sued Rubbermaid, Inc. ("Rubbermaid"), alleging that Rubbermaid is liable for damages in the amount of $1,691,298.08 because Rubbermaid failed to reimburse them for time and expenses incurred in selling products which Rubbermaid later decided not to manufacture. During a nine-day, bench trial, which began on June 4, 2002, this Court heard the evidence, considered

the law and the arguments before it, and now finds that Rubbermaid is liable to the Di Gennaros in the amount of $299,578.61. The Court grants judgment in the Di Gennaro's favor for the reasons set forth in the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Margitta Di Gennaro, a citizen of the State of Florida, was at all relevant times the president and sole shareholder of Core Products Europe, Inc. ("Core Products"), a Florida corporation with its principle place of business in Florida. Core Products was primarily involved in the sales of home health care products in Europe and the Middle East. *See* Mrs. Di Gennaro Test. at 45, PTS at ¶ 5. Mario Di Gennaro, Margitta's husband, assisted in the business of Core Products, but at times was involved in developing a Wisconsin corporation called Tamarac, which was also in the home health care industry.

2. George Higgs, was the owner of Carex Corporation, a distributor of health care products with its principle place of business in New Jersey. *See* Higgs Test.[1]; PX6.

3. Rubbermaid Inc., was at all relevant times an Ohio corporation with its principle place of business in Ohio. *See* PTS ¶ 5.

4. In June 1994, the Di Gennaros entered into an oral agreement with George Higgs, the President of Carex Corp. *See* Mr. Di Gennaro Test. at 119–20. The Di Gennaros agreed that Core Products Europe (then known as Core Products GMBH [2]), a corporation owned by Mrs. Di Gennaro, would be the exclusive European

sales representative for Carex. *See* Mr. Di Gennaro Test. at 199–20; PX6. According to the agreement, the Plaintiffs were to market and sell Carex health care products in Europe and the Middle East and in consideration would receive commissions equal to 10% of their sales. *See* Mr. Di Gennaro Test. at 119–20; Higgs Test. Under the agreement, the Di Gennaros would be responsible for all the expenses they incurred in the sales and marketing of the products. *See* Higgs Test.

5. In July of 1994, Carex was purchased by Rubbermaid, and was absorbed into Rubbermaid Home Health Care Products ("RHCP"). *See* Mrs. Di Gennaro Test. at 53. George Higgs stayed as the President of Carex/Rubbermaid Home Health Care Division until 1995. *Id.*

6. In August 1994, the Di Gennaros relocated to the United States and Core Products GMBH became inoperative. Mrs. Di Gennaro incorporated a new company, Core Products Europe, Inc., in Marathon Florida.

7. In September 1994, Wayne Schmitt became the general manager of the Rubbermaid Home Health Care division and Darren Horst was installed as Mr. Schmidt's vice-president of sales and marketing. *See* Horst Test.; Schmidt. Test.

8. In November 1994, the Di Gennaros essentially reaffirmed their previous Carex agreement with Wayne Schmidt on behalf of Rubbermaid. *See* Mr. Di Gennaro Test.; Schmitt Test.; Ramos Test.

9. Wayne Schmitt attended some trade shows with George Higgs and the Di Gennaros. At these shows, Schmitt represent-

---

1. In these Findings of Facts some citations to the testimony at trial do not include specific page references. This is because the full transcript of the trial was not available to chambers at the time of the drafting of these findings.

2. GMBH is a German suffix denominating an incorporated association, similar to "Inc." or "Corp.".

ed to the Di Gennaros and to customers that Rubbermaid was going to revolutionize the market of health care products. *See* Mrs. Di Gennaro Test. at 56. At trade shows, Rubbermaid displayed prototypes of the newly developed products and a poster featuring pictures of the prototypes with the caption "You Spoke We Listened ... and *created* the most innovative line of patient aids in history." *See* PX11 (emphasis added); PX1; PX12; PX13.

10. Rubbermaid executives believed that the new products would be produced and that it was reasonable for the Di Gennaros to believe that the products were going to be manufactured. *See* Horst Test.; Schmidt Test.; Maguire Test.; Rubbermaid July 14, 1995 Letter to Customers, PX14 ("we are in an excellent position to service your orders on all new products.") Rubbermaid had made a "commitment" to the Di Gennaros to produce and ship the new products. *See* Horst Test.; Schmidt Test.

11. The Di Gennaros were encouraged by Rubbermaid to "Sell our new products and programs hard ..." *See* PX44.

12. The Di Gennaros were supplied with a list of prospective shipping dates for the new products. *See* Maguire Test.; PX24. This list was periodically updated, indicating delays in the release dates of the new products. *Id.*

13. Rubbermaid did have an existing line of home health care products in stock that was available for sale. *See* Schmidt Test.; Maguire Test. However, there was a minimal demand for the existing line of products in Europe and the Middle East because these products were available elsewhere for lower prices. *See* Mr. Di Gennaro Test.; Mrs. Di Gennaro Test. Nonetheless, the Di Gennaros sold approximately $720,000 worth of existing products by using the new products to excite buyers. These existing products were

shipped and the Di Gennaros received a 10% commission, totaling $72,000.

14. In June of 1996, RHCP was eliminated as a separate division and was placed under Rubbermaid's Commercial Products Division. Joseph Ramos was the head of Rubbermaid's Commercial Products Division. Patrick Brandt was titled vice-president and general manager of RHCP and was placed in charge of the day-to-day operations.

15. In September 1996, the Di Gennaros received a letter indicating that Rubbermaid's first priority was "... to stabilize the business and install appropriate business processes to insure long term, healthy growth. Since this requires virtually all our resources today, we will focus our efforts on North America for the next 6 to 12 months." *See* PX17.

16. In March 1997, Rubbermaid, having decided it no longer wanted to operate under a verbal agreement, faxed the Di Gennaros a written sales representative agreement. *See* PX16. There was some dispute over the terms of the written contract and it was never signed. *See* Mr. Di Gennaro Test.; Schmidt Test.; Ramos Test.; PX9.

17. In May 1997, the Di Gennaros were given 90 days notice that Rubbermaid was terminating their relationship. *See* PX18.

18. Rubbermaid was aware that the Di Gennaros had been taking orders for the new products and that the Di Gennaros had "invested hundreds of thousands of dollars" in the marketing and selling of these products. *See* Schmidt Test.; Brandt Test. Nonetheless, Rubbermaid decided not to manufacture the new products due to unspecified production problems. *See* Horst Test.; Schmidt Test.; Ramos Test.

19. The Di Gennaros had approximately $590,000 in total business expenses from 1994 to August 1997. *See* PX8. These business expenses include costs for all of the businesses that the Di Gennaros represented. *See* Mrs. Di Gennaro Test. Approximately $30,000 of Core Products Europe's expenses was for American Orthomed, a corporation established by Mario Di Gennaro and operating for approximately three months during the subject period. This $30,000 is not chargeable to Rubbermaid.

20. The Di Gennaros claim that they spent approximately 70–90% of their time marketing and selling Rubbermaid. *See* Mr. Di Gennaro Test. at 167; Pl.'s Proposed Finding of Facts at ¶ 28.

21. The Di Gennaros claim that 85% of the $560,000 in expenses should be attributed to Rubbermaid due to the fact that they worked 85% of the time for Rubbermaid. Therefore, the Di Gennaros are claiming that Rubbermaid is responsible for $476,775.08 of Core Products Europe's expenses for the said period.

22. The Di Gennaros had commitments for 4.5 million to 5 million in sales of new products to European customers. *See* PX4; PX10. Assuming these commitments would have been honored, these sales would have resulted in $450,000 to $500,000 in commissions for the Di Gennaros. Additionally, Core Products Europe had received approximately $1,834,000 in purchase orders for new and old products. *See* DX51. Of those sales, Rubbermaid shipped approximately $720,000 worth of goods and the Di Gennaros did receive approximately $72,000 in commissions. Approximately $1,110,000 worth of purchase orders were not fulfilled.

23. The Di Gennaros, through testimony of their expert Hughlett Henderson, President of HCI Corporation, presented evidence of the estimated value of their services. *See* Henderson Test. Mr. Henderson estimated that had they been salaried employees, Mrs. Di Gennaro would have made $144,375 per year and Mr. Di Gennaro would have made $187,500 per year working for Rubbermaid 85% of their time. *Id.* Additionally, Mr. Henderson estimated that the Di Gennaros would have earned $109,219 per year in benefits. *Id.* The Di Gennaros claim $1,286,523 (estimated salary and benefits) minus commissions already received $72,000, for a total of $1,214,523. The total damages the Di Gennaros claim are $1,214,523 (adjusted salary and benefits) plus $476,775.08 (85% of total expenses) equaling $1,691,298.08.

24. Mr. Schmidt testified that if Rubbermaid had hired Mrs. Di Gennaro as a salaried employee working full time in Europe, it would have paid her a base salary of approximately $45–60,000. Additionally, Mr. Ramos stated that Rubbermaid normally paid company employed sales representatives working full time approximately $60–70,000. *See* Ramos Test.; Schmidt Test.

### Conclusions of Law

1. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy is greater than $75,000.

2. In this case, the Di Gennaros and Rubbermaid entered into an oral executory contract. An executory contract is one where it is stipulated by the agreement, upon a sufficient consideration, that something is to be done or not done by one or both the parties. *See Farrington v. State of Tennessee,* 95 U.S. 679, 683, 24 L.Ed. 558 (1877); *TLZ Properties v. Kilburn–Young Asset Mgmt. Corp.,* 937 F.Supp. 1573, 1581 n. 5 (M.D.Fla.1996), *aff'd,* 119 F.3d 10 (11th Cir.1997).

3. The verbal agreement entered into by the parties contemplated that the Di Gennaros would be Rubbermaid's exclusive European sales agents and that they would generate orders for Rubbermaid products, in exchange for 10% of the sales revenue generated by those orders, upon the shipping of the goods.

4. The consideration of a 10% commission and a condition of exclusivity was sufficient consideration to make the oral contract a valid executory agreement. *See Farrington,* 95 U.S. at 683 ("Only a slight consideration is necessary ... The amount of the impairment of the obligation is immaterial.")

5. The Plaintiffs invested hundreds of thousands of dollars in selling Rubbermaid's new products. Nonetheless, they were unable to profit from their agreement with Rubbermaid or to even recoup their costs because Rubbermaid choose not to produce the only goods with any real market value in the Plaintiffs' territory.

6. The law is clear in Florida that where a principal does not give an agent a "sufficient opportunity" to recoup costs incurred in good faith in serving the principal, the principal is required to compensate the agent for such costs. *See Florida–Georgia Chem. Co. v. Nat. Labs.,* 153 So.2d 752, 755 (Fla. 1st DCA 1963) ("if it appears the agent, induced by his appointment, has in good faith incurred expense, devoted time, and bestowed labor in the matter of the agency without having a sufficient opportunity to recoup such outlays from the undertaking, the principal will be required to compensate him in that behalf"). *See also Sanchez v. Crandon Wholesale Drug Co.,* 173 So.2d 687 (Fla.1965) (adopting the recoupment doctrine of *Florida–Georgia Chem.*), *quoting Meyer v. Pulitzer Publ'g Co.,* 156 Mo. App. 170, 136 S.W. 5 (1911).

7. In *Florida–Georgia Chemical,* the issue was whether the principal had given the agent a sufficient opportunity to recoup costs where the principal terminated their at-will agency agreement early in the relationship. In the present case, Rubbermaid failed to give the Plaintiffs a sufficient opportunity to recoup costs, not because it terminated the Plaintiffs prematurely but because it never produced the products that the Plaintiffs were selected to sell, The holding of *Florida–Georgia Chemical,* however, should not be limited to situations of premature termination, but interpreted to include any unilateral act of the principal which prevents an agent from having a sufficient opportunity to recoup reasonable costs incurred in good faith. This is merely an application of the implied covenant of good faith and fair dealing. *See Sharp v. Williams,* 141 Fla. 1, 192 So. 476, 480 (1940) ("When a party stipulates that another shall do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing that thing; and indeed if the situation is such that cooperation of one party is an essential prerequisite to performance by the other, there is not only a condition implied in fact qualifying the promise of the latter, but also an implied promise by the former to give the necessary cooperation ... Prevention or hindrance by a party of any occurrence or performance requisite under the contract for the creation or continuance of a right in favor of the other party, or the discharge of a duty by him, is a breach of contract.") (citations omitted); *see also Hanover Realty Corp. v. Codomo,* 95 So.2d 420, 423 (Fla.1957); *Poling v. Capital Sys. Inc.,* 856 F.2d 187 (4th Cir.1988) (unpublished disposition); *Van Praag v. FR Corp.,* 73 N.Y.S.2d 82, 83 (N.Y.Sup.1947); 11 Fla.Jur.2d Con-

tracts § 285; 17A Am.Jur.2d Contracts § 703.[3]

■ 8. Rubbermaid argues that notwithstanding their failure to manufacturer the only products with real financial value to the Plaintiffs, the Plaintiffs had a sufficient opportunity to recoup costs because the Plaintiffs (a) could have focused more on sales of existing products; (b) should not have invested so much in products which were not ready to ship; and (c) should not have spent so much money on Rubbermaid rather than other manufacturers. Additionally, Rubbermaid argues that giving the Plaintiffs more time would have only resulted in additional losses. Rubbermaid's arguments are without merit. While the Plaintiffs could have focused more on sales of existing products, the evidence at trial showed that (a) there was little to no market for the existing products in the Plaintiffs' territory; (b) the Plaintiffs were only able to sell the few existing products that they did sell by tempting customers with the new products; and (c) Rubbermaid encouraged the Plaintiffs to focus on the new products. Second, although I agree that the Plaintiffs should not have invested so much in these products, I find that it was reasonable to spend more than $72,000 (the only amount recouped) in selling the new products. Therefore, some of the Plaintiffs' unrecouped expenses are reasonable, and the issue of how much of their expenses were reasonable goes to damages not liability. Third, the issue of whether the Plaintiffs should have spent more time on other manufacturers is irrelevant because

under *Florida–Georgia Chemical* it would not matter whether the Plaintiffs' business made a net profit due to other clients. *Florida–Georgia Chemical* requires reimbursement for losses specifically related to Rubbermaid, regardless of the Plaintiffs overall financial success. Finally, it is irrelevant that the Plaintiffs would not have recouped costs even if given additional time, because the Court has found that Rubbermaid's failure to give the Plaintiffs a "sufficient opportunity" under *Florida–Georgia Chemical* was not because of premature termination, but because it failed to produce the promised products.

9. Rubbermaid also argues that there is a known industry custom or practice that there are no guarantees that a manufacturer will end up producing any given new product. This is no different, however, from the situation in *Florida–Georgia Chemical.* In that case, there was also a known industry custom and practice (that a terminable at will contract could be terminated at any time.) Nonetheless, the Court adopted an exception to the general custom and practice that allowed for recoupment of reasonable expenses. This same rule of recoupment applies to the present facts, notwithstanding any contrary industry custom or practice.

10. Moreover, even if there generally is an implied risk that a manufacturer will not produce a new product, the Court finds that no implied risk or custom was incorporated into this agreement. *See* 21A Am. Jur.2d., Custom and Usage § 28 ("Usages and customs which provide a meaning inconsistent with the manifest intention of

---

**3.** The cases make clear that the recoupment rule may not apply where there is a specific agreement to the contrary. *See Hanover Realty Corp. v. Codomo,* 95 So.2d 420, 423 (Fla. 1957). This specific agreement must "be expressed in language which would be readily understood by a layman and leave no room for doubt. The specificity of such an agreement should be precisely formulated, explicit, positive, direct and should admit of no misunderstanding." *P.C. Price v. Rogers Ent.,* 418 So.2d 1243, 1246 n. 3 (Fla. 4th DCA 1982). The Court finds in this case that there was no specific agreement to the contrary, let alone one with the degree of specificity and clarity required under Florida law.

the parties can never be shown for the purpose of affecting their rights or of controlling their real intention. No custom or usage, however well established, can be incorporated into a contract if it is inconsistent with the clear intention, either expressed or necessarily implied, of the parties.") *see also* 11 Fla.Jur.2d Contracts § 172. Rubbermaid's words and actions suggested that there was no risk with regard to these particular products.

11. Rubbermaid displayed prototypes of the products in question, suggesting that Rubbermaid actually had the ability to make the products. *See* PX1. Furthermore, Rubbermaid advertised to customers that it had already "created" these products. *See* PX11. The Di Gennaros had no reason to know that the products would not come into existence. *See* Schmidt Test.

12. Moreover, the evidence at trial demonstrated that Rubbermaid, at all times, encouraged the Di Gennaros and its other agents to aggressively sell these products and at no time did Rubbermaid even suggest that there was any possibility that the products would not be produced.[4] *See* Rubbermaid's Letter to Sales Representatives, PX44 ("Sell our new products and programs hard. We have tremendous capacity on these new products, and they represent the best value for your customers & our consumers.")

13. Rubbermaid became aware at some point that the Di Gennaros were taking orders for these products and were spending thousands of dollars selling these products. *See* Brandt Test. at 141 ("Mario said

he invested hundreds of thousands of dollars."); Schmidt Test.

14. Rubbermaid's executives and expert testified that it is bad business practice for an independent sales representative to invest heavily in new products where there is a risk that the products might never be produced. *See* Schmidt Test.; Novick Test. The fact that Rubbermaid was aware that the Di Gennaros were investing heavily in the new products yet provided no warning suggests that Rubbermaid did not believe there was a risk that these products would not be produced. This inference is supported by the testimony of Rubbermaid executives who indicated that at all relevant time periods, they fully believed the products would be produced. *See e.g.* Horst Test.; Schmidt Test.; Maguire Test.; Rubbermaid July 14, 1995 Letter to Customers, PX14 ("we are in an excellent position to service your orders on all new products.")

15. Additionally Rubbermaid's executives admitted that they had made a commitment to the Di Gennaros to produce and ship the new products and that they did not fulfill their obligation. *See* Horst. Test.; Schmidt Test.

16. The risk in this contract to the Di Gennaros was that they would spend large sums in an attempt to sell these goods and then find themselves unable to find buyers. The Court finds that there was no risk, either express or implied, that Rubbermaid would decide not to produce the goods.

---

4. In a letter dated September 12, 1996 Rubbermaid informed the Plaintiffs that they should "wait until [the] product is imminently available before informing customers when they might expect shipment" because "dates in the past have lead to disappointment." Nothing in this letter, however, suggests a possibility that the products would never be made. To the contrary, the fact that Rubbermaid asked the Plaintiff, without qualification to "wait until [the] product is imminently available," suggests that at some point in the future, the product would be imminently available and then available shortly thereafter.

17. Rubbermaid also asserts a number of affirmative defenses including payment, estoppel/waiver, and failure to mitigate damages. The Court finds that these affirmative defenses are unavailing. With regard to the payment defense, the fact that Rubbermaid paid the Di Gennaros $72,000, does not relieve them of their obligations under the recoupment doctrine and the implied covenant of good faith and fair dealing. With regard to the doctrine of estoppel and waiver, the Court finds that the Plaintiffs did not waive their rights under the recoupment doctrine and the implied covenant of good faith and fair dealing, because the rights did not even arise until it became certain that Rubbermaid was not going to produce the new products. *See Fireman's Fund Insurance Co. v. Vogel*, 195 So.2d 20, 24 (Fla. 2d DCA, 1967) (finding that there can be no waiver unless the party against whom waiver is invoked is in possession of all material facts). With regard to the Plaintiffs' alleged failure to mitigate damages, if the Plaintiffs did fail in this regard, this can be attributed in part by Rubbermaid's failure to adequately and accurately inform the Di Gennaros as to the status of, problems with, and risks involved in the manufacture of the its new products. Moreover, to the extent that the damages the Plaintiffs claim are unreasonably high, the Court has reduced them accordingly. *See* discussion *supra*.

*Damages*

18. Under the recoupment doctrine, the damages which the Plaintiffs are entitled to recover is limited to their reasonable expenses. *See Sanchez*, 194 So.2d at 648 (permitting recovery only of expenses); *Sanchez v. Crandon Wholesale Drug Co.*, 167 So.2d 640, 641 (Fla. 3rd DCA 1964) (Carroll, J. dissent) ("the law implies an obligation to pay damages for reasonably incurred *preliminary expenses.*") (emphasis added); *Ag–Chem Equip. Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 487 (8th Cir.1973) ("recoupment has traditionally been confined to the recovery of preliminary expenses incurred in setting up a distributorship system, such as sums expended for initial promotion and renting a facility"); *Sofa Gallery, Inc. v. Stratford Co.*, 872 F.2d 259, 263 (8th Cir.1989) (limiting damages to "any unamortized capital expenditures that would have produced profits had the distributorship continued"); *Allied Equipment Co. v. Weber Engineered Products*, 237 F.2d 879 (4th Cir. 1956) (limiting damages to "unrecouped expenditures"); *See also* Restatement (Second) of Contracts, § 349 (1979 Main Vol.), Illustration 1; 3 Am.Jur.2d, *Agency*, § 245 (2002); 62B Am.Jur.2d, *Private Franchise Contracts*, § 541.

19. While some Courts have compensated agents for the reasonable value of their services, they have typically done so where there was also unjust enrichment. *See e.g., Gibbs v. Bardahl Oil Co.*, 331 S.W.2d 614 (Mo.1960); *Beebe v. Columbia Axle Co.*, 233 Mo.App. 212, 117 S.W.2d 624 (1938); *Meyer v. Pulitzer Pub. Co.*, 156 Mo.App. 170, 136 S.W. 5, 7 (1911); *Cook v. MFA Livestock Ass'n*, 700 S.W.2d 526, 527 (Mo.App.1985). These cases are not binding on this Court and I find that the better view is that recoupment should be limited to reasonable expense. In any case, the cited cases are distinguishable because in the present case the Court finds that Rubbermaid has not been unjustly enriched by the Plaintiffs services.

20. Finally, even if it were appropriate for the Court to compensate the Plaintiffs for the reasonable value of their services, the Court would be unable to do so in the present case, because the value of those services are too speculative. *See Ballard v. Krause*, 248 So.2d at 235 ("Damages recoverable on either theory, breach of

contract or quantum meruit, must be proved with reasonable certainty and cannot be left to speculation or conjecture"); *see also Miller v. Allstate Ins. Co.*, 573 So.2d 24 (Fla. 3d DCA 1990) (holding that damages for breach of contract must be proven with reasonable certainty).

21. The Plaintiffs attempted to establish the value of their services through an expert who testified what he believed they would be paid had they been salaried employees. Independent sales representatives, like the Di Gennaros, however, are never paid on a salary basis and are always paid based on commission, so any estimate of what a fair salary would be is inherently speculative. The Plaintiffs' expert, himself, indicated an enormous range of potential salaries, ranging between $85,000 and $200,000 annually. His estimate that Mr. Di Gennaro was worth $187,500, was greater than $100,000 a year more then Rubbermaid paid its own company sales representatives. The Plaintiffs' expert admitted that when he calculated the value of the Plaintiffs' services he was not aware how much Rubbermaid paid its own company sales representatives and that this information would have been helpful to him in calculating the Plaintiffs' value. For these reasons, *inter alia*, the Court finds that the value of the Di Gennaro's services is too speculative to be the basis of a damage award.[5]

22. Because only expenses are recoverable under the recoupment doctrine and because the value of the Plaintiffs' services is in any case too speculative, the Court must limit its award to reasonable expenses. The Plaintiffs have presented the total amount of their expenses and argued that they are entitled to reimbursement for 85% of their expenses, since they

**5.** Even if I were to award the reasonable value of the Plaintiffs' services, I would have to award significantly less than the amount the Plaintiffs are seeking for several reasons. First, independent sales representatives are hired in large part to minimize risk, because the manufacturer does not have to sink any costs, such as salary and sales expenses, into the undertaking. Thus it is unlikely that manufacturers such as Rubbermaid would ever be willing to pay independent sales agents such high salaries, a fact which would inevitably depress the Di Gennaros' market value. Second, it appears that much of the "added value" the Di Gennaros provided was in the form of their contacts with European customers. However, no evidence was presented that Mr. Di Gennaro had different contacts than had Mrs. Di Gennaro. Thus, once a manufacturer were to hire one of the Di Gennaros, the value of the other one would be significantly lower. Moreover, after the first year in which the Di Gennaros established connections between their customers and Rubbermaid, their value would decline. Mr. Henderson did not take any of these factors into account. Third, the contract was actually between Rubbermaid and Mrs. Di Gennaro / Core Products Europe and not with Mr. Di Gennero. *See* February 1, 1995 Letter from Mr. Higgs, PX6 ("She is the European Exclusive Sales Representative"); *see also* Mrs. Di Gennaro Test. at 45 ("I was or I am, of Core Products Europe, the owner, shareholder and I hold all of the positions, all offices that are in that corporation") Mr. Di Gennaro was neither a party to the contract nor is he a plaintiff in this case. At most, Mr. Di Gennaro was an employee of the Plaintiff. *See* Pl's Proposed Findings of Fact at ¶ 2 ("Mario Di Gennaro ... was an employee of Core Products GMBH") Mr. Di Gennaro simply volunteered his services to his wife and since he is not a party to the contract nor the lawsuit, the Plaintiffs are not entitled to be compensated for the reasonable value of his services. Fourth, as discussed *infra*, the Court finds that the Plaintiffs would be entitled for reimbursement for significantly less than 85% of their time. Finally, the contract price is generally the upper limit of what may be recovered. *See e.g., Ballard v. Krause,* 248 So.2d 233, 234–35 (Fla. 4th DCA 1971); *Levin v. Rosenberg,* 372 So.2d 956, 958 (Fla. 3d DCA 1979); *Hazen v. Cobb,* 96 Fla. 151, 117 So. 853 (1928). In this case, the Plaintiffs have presented evidence that they would have made $611,000 at most under the contract had Rubbermaid timely produced the new products. *See infra* n. 4

estimate that they spent 85% of their time working on Rubbermaid.

*Eighty Five Percent on Rubbermaid*

23. There are at least three problems with the assumption that the Di Gennaros should recover for 85% of their expenses. First, the 85% figure is entirely speculative and based on the Di Gennaro's (and their employees) own colored view of how much time they spent. Even the Di Gennaro's themselves are not sure, how much time they spent. As, Mr. Di Gennaro stated "Was it eighty percent? Was it seventy percent? Was it eighty-five? Was it ninety? In that area. There are times that I worked for Rubbermaid 110 percent and there are times that I worked for them 75 percent, so it is kinda hard to exactly focus in." Mr. Di Gennaro Test. at 167.

24. The Plaintiffs have admitted that they may have spent as little as 70% of their time working on Rubbermaid. *See* Pl.'s Proposed Finding of Facts at ¶ 28 ("While continuing to represent manufacturers other than the Defendant, the Plaintiffs spent approximately 70–90% of their time and financial resources in promoting the Defendant's products.")

25. The parties presented the full quantity of documents in their business office related to Rubbermaid for comparison with the full quantity of documents related to all other clients. It appeared to the Court that, at most, 60 to 70 percent of the documents were related to Rubbermaid. This is more consistent with the Plaintiffs' lowest estimate of how much time they spent on Rubbermaid.

26. Additionally, even if the Plaintiffs did spend 85 percent of their time and expenses solely on Rubbermaid, the Court finds that this was an unreasonable amount of time and resources to spend. This amount is unreasonable for three reasons. First, it was unclear from the Di

Gennaro's testimony to what extent they took advantage of economies of scale but if they did, then this suggests that 85 percent figure is high and if they did not, this was a mistake for which Rubbermaid should not be responsible. In other words, when the Plaintiffs mailed brochures, made telephone calls, and exhibited at trade shows they did or frequently could have simultaneously taken care of business for multiple clients, saving significant resources. Second, after Rubbermaid continually delayed in producing the new products and certainly after Rubbermaid indicated by letter that it was no longer focusing on the European market, it was unreasonable for the Plaintiffs to continue spending so liberally. Third, the Court finds that almost $600,000 was simply an unreasonably high amount to spend on Rubbermaid, based on the Plaintiffs' actual Rubbermaid earnings, non-speculative anticipated Rubbermaid earnings (approximately $600,000) and the amount the Di Gennaros spent on each of their other clients.

27. Furthermore, Rubbermaid should not be responsible for all the time and resources the Di Gennaros spent working for Rubbermaid. For instance, Rubbermaid should not be responsible for any time and resources the Di Gennaros spent marketing and selling approximately $720,000 worth of their old products, because Rubbermaid produced those products and the Di Gennaros were paid a fair (if not high) commission for the sale of the products. Moreover, it is unclear that Rubbermaid should be responsible for any time the Di Gennaros spent marketing or selling goods in South America. The Di Gennaros were not hired to sell goods anywhere outside of Europe and the Middle East, and they presented no evidence that Rubbermaid ever encouraged them to sell in South America. As such, the Di

Gennaros have presented no evidence that there was ever a contract for the Di Gennaros to sell to South America. The Court finds that approximately 12% of the time the Di Gennaros were working on Rubbermaid, they were working on these endeavors for which they should not be or for which they were already compensated.[6]

28. The Court concludes that while any percentage is speculative, a fair percentage to use is **61.6%**, which represents the lower end of the Plaintiffs' estimate (70%) minus 8.4% (70% (the amount of time the Di Gennaro's spent on Rubbermaid) of 12% (the amount of time the Di Gennaro's spent on Rubbermaid which was already or should not be compensated-calculated at footnote 6)).

*Expenses*

29. In total, Core Products expended $590,911.86 on the sales and marketing of all Rubbermaid and non-Rubbermaid products. *See* PX8. However, the Court finds that it would be unfair and unreasonable to hold Rubbermaid responsible for 61.6% of all of these expenses.

■ 30. For instance, the Plaintiffs are seeking reimbursement of $57,962.64 ($613 for 1994, $113,382.12 for 1995, 19,483.76, and $19,483.76 for 1997) for the lease of a Lexis and Toyota Four Runner as well as auto insurance and related expenses. *See* Mrs. Di Gennaro Test. at 27. These vehicles were used only tangentially for Rubbermaid. They were used primarily by Mrs. De Gennaro to commute to work. *See Id.* at 25. In cross examination, Mrs. De Gennaro admitted that it "might not

be" fair to charge this expense to Rubbermaid and this Court agrees. *See Id.* at 27. This figure will be deducted from the total that the Plaintiffs are entitled to receive.

■ 31. The Di Gennaros are also seeking 85% of $35,797.58 ($1,460.25 for 1994; $13,167 for 1995; $15,752.33 for 1996 and $5,418 for 1997) in reimbursement for rent expenses. *See Id.* at 54. However, the Di Gennaros would have needed to rent space to run their business whether Rubbermaid was their client or not. The office did not just serve Rubbermaid but all the other clients of Core Products including: Tamarac, Philadelphia Collars, and American Orthomed. *See Id.* at 55–57. The Plaintiffs have presented no convincing evidence that there was any relationship between the amount of time they were allegedly spending on Rubbermaid and the required size of their office space. The parties presented to the Court the full quantity of documents the Di Gennaros kept which were related to Rubbermaid and these documents could have been maintained on a small shelf. While Rubbermaid may be responsible for covering some of the costs of renting an office, the Plaintiffs' demands are simply unreasonable. The Court finds that one third of the Plaintiffs' rent is a "Gennarous" amount for which to hold Rubbermaid responsible.

32. Therefore, the total of the Plaintiffs expenses for which the Court will hold Rubbermaid responsible is **$299,578.61** (.616 × ($560,911.86 [7] − $57,962.64 − $35,797.58) + (.33 × $35,797.58)).

---

6. The Court derived this 12% figure by dividing $720,000 (the Rubbermaid sales for which the Plaintiffs were paid) by $6,111,000 (the Rubbermaid sales and commitments for which the Plaintiffs were not paid). This represents the percentage of Rubbermaid sales for which the Di Gennaros were compensated. The speculative possibility that the Di Gennaros may have made more sales of the new products had Rubbermaid produced the

new products is offset by the fact that the Court assumed that 100% of the commitments would be honored and by the fact that the Court did not increase the 12% figure for time spent working outside of Europe and the Middle East.

7. The Di Gennaros admit that $30,000 of the $590,911.86 is not properly attributable to Rubbermaid. *See* Findings of Fact ¶ 19.

33. Any of the foregoing conclusions of law which may represent findings of fact are adopted as findings of fact.

### *CONCLUSION*

Therefore, having been advised in the premises, it is hereby ORDERED AND ADJUDGED that JUDGMENT IS ENTERED IN FAVOR OF THE PLAINTIFFS MARGITTA DI GENNARO AND CORE PRODUCTS EUROPE AND AGAINST THE DEFENDANT RUBBERMAID. The PLAINTIFF shall recover damages in the amount of $299,578.61. This case is CLOSED. Costs which are appropriate shall be taxed by a separate motion and order.